**Carl M. HANSEN, et al., Relators,**

v.

**COUNTY OF HENNEPIN, Respondent.**

No. C8–94–631.

Supreme Court of Minnesota.

Jan. 13, 1995.

Rehearing Denied March 1, 1995.

---

1. *State v. Johnson,* 444 N.W.2d 824 (Minn.1989).

Mark S. Anderson, Gregory P. Brenny, Hillstrom, Bale, Anderson, Polstein, Pearson & Hill, Ltd., Minneapolis, for relators.

Michael O. Freeman, Hennepin County Atty., Paul R. Jennings, Asst. County Atty., Minneapolis, for respondent.

## OPINION

ANDERSON, Justice.

This case comes to us on certiorari to the Minnesota Tax Court. Relators, Carl and Helen Hansen, challenged the 1990 assessment of market value for two parcels of unimproved property. The tax court lowered the market value of both parcels, but the Hansens appeal, arguing that figures adopted by the court for its development cost approach to value analysis were not supported by the evidence and the court's reliance on the market approach to value was erroneous and not supported by the evidence. We affirm.

### I.

On May 14, 1991, the Hansens filed a petition with the tax court challenging the County of Hennepin's January 2, 1990 assessment of market value for two parcels of unimproved property and four duplexes. The Hansens appeal only the tax court's conclusions as to the market value of the two unimproved parcels.

The two parcels are located in the northwest corner of the City of Edina, Minnesota.

The larger parcel, Outlot A, is approximately 53 acres and reportedly is the largest tract of undeveloped property in Edina. Edina approved a preliminary plat for Outlot A in 1977. Based on this plat, an estimated 89 single-family residential lots, averaging four-tenths of an acre per lot, could be developed on the property. The smaller parcel, Outlot B, is approximately 1.81 acres. It was not subdivided on the assessment date in question, but it was zoned for residential development. A residential street separates the two parcels.

The Hennepin County assessor concluded that on the date of assessment, Outlot A had a market value of $3,700,000, and Outlot B had a market value of $125,400. The Hansens challenge these assessments. At trial, each party submitted an appraisal report and presented the testimony of their own appraisal expert. The Hansens' appraisal expert concluded that the market value of Outlot A was $2,200,000 and the market value of Outlot B was $75,000. The county's appraisal expert concluded that the market value of Outlot A was $4,630,000 and the market value of Outlot B was $125,400.

### A. Hansen Appraisal

The Hansens' appraisal expert, Mark Parranto, a licensed appraiser, determined the market value of Outlot A by using both the market approach to value, which is based on an analysis of comparable land sales, and the development cost approach to value.[1] Parranto did not separately analyze Outlot B, but instead calculated its market value by multiplying its acreage by the price per acre he obtained for his market value of Outlot A.

For his market approach analysis for Outlot A, Parranto first identified market data on comparable properties. He selected 10 property sales ranging in size from 4.31 acres to 38.27 acres. Only one of these sales was in Edina; the rest were from adjacent communities. Five of the sales were in the City of Eden Prairie and the other four were in

the City of Bloomington. Parranto made adjustments in the comparable sales for time, size, park dedication and topography. He opined that the price per unit of the 89 single-family lots on Outlot A was $26,500. The rounded market value for Outlot A under his market approach analysis was $2,350,000.

Parranto also used a development cost approach analysis to value Outlot A. Parranto first analyzed the development plan for the property and determined the number of lots available for development. He then determined the average lot price by analyzing all relevant lot sales and subdivision developments in Edina. He opined that a standard lot would sell for $100,000, and a cul-de-sac lot would sell for $125,000. Based on these figures, Parranto estimated that the selling period for all of the lots would be 10 years. He did note, however, that there were lots in Edina selling in the $200,000 price range, but he opined that it would take 20 years to develop the subject property at such higher prices. Next, Parranto determined and analyzed interest rates, equity returns, inflation, cash flow, and real estate taxes. Finally, Parranto accounted for more than 20 development-related costs. These included such expenses as grading, sewers, utilities, and consulting fees. Taking all of these factors into consideration, Parranto opined that the development cost approach value for Outlot A was $2,100,000.

For his final conclusion as to the market value of Outlot A, Parranto testified that he placed more weight on his development cost approach analysis and less weight on his market approach analysis. He concluded that the market value of Outlot A was $2,200,000. As noted above, Parranto did not separately calculate the market value of Outlot B. Instead, he calculated its market value by multiplying its acreage by the price per acre he obtained for his market value of Outlot A. Dividing the market value he obtained for Outlot A by 53 acres, he estimated that the price per acre was $41,509. He then

1. "The development cost approach is designed to reflect, through cash flow analysis, the current price a developer-purchaser would be warranted in paying for the land, given the cost of developing it and the probable proceeds from the sale of

developed sites." *County of Ramsey v. Miller,* 316 N.W.2d 917, 920 (Minn.1982) (citing American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 140 (7th ed. 1978)).

multiplied this value by 1.81 acres to determine the market value of Outlot B. Based on this calculation, his rounded estimated market value for Outlot B was $75,000.

## B. County's Appraisal

The county's appraisal expert, Edward Peterson, an assessor for Edina, considered both the market approach and the development cost approach in his initial value analysis. His final valuation, however, was based exclusively on the market approach. Peterson testified he performed two "trial" analyses based on a development cost approach analysis, but he concluded the development cost approach was subject to too much variation to be reliable for the property in question. He also suggested that when good comparable land sales exist for a reliable market approach analysis, as he believed they did in this case, a speculative development cost approach analysis was not useful.

For his market approach analysis, Peterson selected five comparable sales of unimproved land ranging in size from 4.3 to 51 acres. Four of the land sales were in Edina and one, the 51-acre sale, was in Bloomington. That 51-acre tract of unimproved land sold for $3,000,000 in 1987. Peterson made adjustments in the comparable sales for time, acreage, and location. Based on these adjustments, he opined that the price per square acre for both parcels was $87,100. He estimated that the market value of Outlot A, based on 53.16 acres, was $4,630,000 and the estimated market value of Outlot B based on 1.92 acres was $125,400.

## C. Tax Court Set of Variables

After hearing the testimony of the two experts, the tax court requested that each expert perform three additional development cost approach analyses based on sets of variables provided by the court. The three sets of variables selected by the court were: (1) a standard lot price of $125,000, a cul-de-sac lot price of $150,000, an entrepreneurial profit of 20%, and a selling period of 10 years; (2) a standard lot price of $140,000, a cul-de-sac lot price of $175,000, an entrepreneurial profit of 20%, and a selling period of 10 years; and (3) a standard lot price of $140,000, a cul-de-sac

lot price of $175,000, an entrepreneurial profit of 15%, and a selling period of 10 years. Otherwise, the variables used by the Hansens' appraiser, Parranto, in his original development cost approach were to control.

Parranto complied with the tax court's order and concluded that the market value of Outlot A was: $2,943,733 using the first set of variables; $3,502,946 using the second set of variables; and $3,843,254 using the third set of variables. In addition, Parranto submitted a second set of unsolicited calculations using a selling period of 20 years, a standard lot value of $140,000, and a cul-de-sac lot value of $175,000. Parranto opined that the higher lot prices would increase the selling period and he felt obligated by professional practice standards to include the additional calculations. Using a 20-year selling period and an entrepreneurial profit of 15%, Parranto opined that the market value of Outlot A was $2,485,614. Using a 20-year selling period and an entrepreneurial profit of 20%, he opined that the market value was $2,253,065. The county objected to the submission of this second set of unsolicited calculations.

The county's appraiser also responded to the tax court's order. Using the court-ordered development cost approach figures, Peterson calculated the market value of Outlot A to be: $3,415,000 using the first set of variables; $4,005,200 using the second set of variables; and $4,229,200 using the third set of variables.

## D. Tax Court Holding

In its November 1993 order, the tax court lowered the market value of Outlot A from the assessed value of $3,700,000 to $3,400,000, and lowered the market value of Outlot B from the assessed value of $125,400 to $112,500. The court reviewed the value methods used by each expert and then discussed the merits and applicability of a development cost approach analysis. It acknowledged that the market approach is the preferred method for valuing unimproved property when sufficient comparable land sales are available. It also noted, however, that the reliability of the market approach is diminished when an appraiser must make ma-

jor adjustments to the sale prices of the comparable properties.

The tax court concluded that both appraisers made major adjustments to the sale prices of their comparable properties, and therefore, a development cost approach, based on several assumptions, would aid the court in determining market value. Most notably, the court assumed that standard lots would sell for $140,000, cul-de-sac lots would sell for $175,000, and the selling period for the property would be 10 years. The court cited scarcity of lots in the Edina area as supporting these lot prices. The court gave weight to both the development cost approach and the market approach for its final conclusions as to the market value of the property. It also indicated that the significant differences in the values obtained by the two experts in their court-ordered development cost approach analyses could be explained by differences in how the experts calculated the entrepreneurial profit percentage.

The Hansens argue the tax court's final conclusions as to the market values of Outlot A and Outlot B were not reasonably supported by the evidence as a whole. They make two arguments to support this position. First, they argue the figures adopted by the court for its development cost approach analysis were not supported by the evidence. Second, they argue the court's reliance on the market approach was erroneous and not supported by the evidence. We reject both arguments and affirm.

## II.

■ This court will not disturb the tax court's valuation of property for tax purposes unless the tax court's decision is clearly erroneous, which means the decision is not reasonably supported by the evidence as a whole. *Westling v. County of Mille Lacs,* 512 N.W.2d 863, 866 (Minn.1994). The tax court's decision should be considered clearly

erroneous only when this court is left with a " 'definite and firm conviction that a mistake has been committed' * * *." *Id.* (quoting *In Re Assessments of Silver Lake Apartments v. County of Olmsted,* 295 Minn. 548, 549–50, 204 N.W.2d 415, 416 (1973)). The taxpayer has the burden of showing that the valuation reached by the assessor is excessive. *Id.* The inexact nature of property assessment necessitates that this court defer to the decision of the tax court unless the tax court has either clearly overvalued or undervalued the subject property, or has completely failed to explain its reasoning.

■ There are three traditional approaches for valuing property: market data or sales comparison, replacement cost, and capitalization of income. *Lewis & Harris v. County of Hennepin,* 516 N.W.2d 177, 178 (Minn.1994). Normally, unimproved or undeveloped property is valued using only the market approach to value. The cost approach is inapplicable to unimproved property because it is premised upon an analysis of the current cost of replacing existing improvements. The income approach is normally not helpful in determining the value of unimproved property because it involves calculating the rental income of the property. A market approach, however, is applicable because it involves comparing the subject property with similar unimproved or undeveloped properties.

### A. *Development Cost Approach*

■■ In this case, the tax court partially relied on a development cost approach analysis. We must, therefore, consider the validity of such an analysis. As noted earlier, the development cost approach is a method of appraising property in which an appraiser attempts to determine the current price a developer would pay for land, given the cost of development and the probable proceeds from the sale of the developed property. *Miller,* 316 N.W.2d at 919–20.[2] In *Miller,*

---

2. A typical development cost approach analysis would include the following steps:

   1. Identify the economic bracket of the residents and check the range of sale prices of typical new homes in the area.

   2. By distribution, or comparison with lot sales in similar subdivisions, decide what figure represents a typical lot value in this category of development.

   3. Study and lay out a subdivision plan to develop typical lots.

this court approved the use of the development cost approach for valuing condemned property. *Id.* at 920; *see also Buzick v. City of Blaine,* 505 N.W.2d 51 (Minn.1993). We have not, however, considered the applicability of a development cost approach analysis in determining the fair market value of property for purposes of taxation. Because we believe a development cost approach analysis may be helpful when valuing property for tax purposes, we approve its use in such cases. We caution, however, that the development cost approach is complex and is susceptible to manipulation; therefore, it should be employed judiciously, when the other traditional methods for valuing property are not wholly reliable and only after a proper foundation has been laid.

■ In *Miller,* we held that the party offering evidence of market value based on a development cost approach analysis must lay a proper foundation before such evidence may be admitted at trial. 316 N.W.2d at 922. This foundation requirement originally stemmed from our desire to ensure that property owners not be allowed to submit evidence based on a speculative development cost approach in an attempt to artificially inflate the value of condemnation awards. *See Buzick,* 505 N.W.2d at 53. We hold this foundation requirement is applicable to tax cases as well. We wish to ensure that parties not be allowed to submit evidence based on a speculative development cost approach to either overvalue or undervalue unimproved or undeveloped property for purposes of tax assessment. The offering party must show the following three conditions before a court will receive evidence obtained using a development cost approach analysis: (1) the land is ripe for development; (2) the owner can reasonably expect to secure the necessary zoning and other permits required for the development to take place; and (3) the development will not take place at too remote a time. *Miller,* 316 N.W.2d at 922.

■ In the present case, we agree with the tax court that the parties laid a proper foundation for the admission of evidence based on a development cost approach analysis. The Hansens do not dispute this conclusion; rather, they argue the lot prices and selling period adopted by the court in its development cost approach analysis were not supported by the evidence. They argue that because their expert was the only expert to conduct an initial development cost approach analysis, the evidence of lot values submitted by their expert was the only reliable evidence of lot values before the court. Essentially, the Hansens contend that only their expert was qualified to conduct a development cost approach analysis, and neither the county's expert nor the tax court was qualified to second-guess the methodology or values used by their expert. We reject this argument.

First, the tax court cited the scarcity of lots in Edina as supporting its higher lot prices. The county's expert did testify at trial that there was a scarcity of lots in the Edina area on the assessment date. Moreover, the Hansens' expert acknowledged that lots in Edina were selling for as much as $200,000. Second, the tax court adopted the 10–year selling period originally submitted by the Hansens' expert. We conclude, as did the tax court, that a 20–year selling period was too speculative under the facts of this case. The testimony at trial indicated that a 10–year selling period was not unreasonable.

Finally, we wish to emphasize that the tax court is wholly capable of assessing the

4. Project the total probable gross sale price for these lots.
5. Estimate development costs to include:
a. Engineering or other fees
b. Cost of streets and utilities
c. Advertising and cost of sales
6. Estimate overhead and administrative costs to include:
a. Taxes and inspection fees
b. Financing fees and carrying costs
7. Deduct these direct expenses for development from the figure derived in Step 4.

8. Deduct an adequate profit allowance to provide incentive for the developer so that the calculated value of the raw land is exclusive of development profit. (Alternatively, profit may be provided for in the rate used for capitalization on the discounting process.)
9. Deduct for time lag by discounting, at an appropriate risk rate, the annual net income flow over the time needed for completion and market absorption of the project.
*Miller,* 316 N.W.2d at 920 n. 1 (quoting *The Appraisal of Real Estate* at 148).

weight of conflicting expert testimony and reaching an intelligent conclusion. The development cost approach, although complex, is essentially no different from any other approach to market value. It involves the analysis of a wide range of data, and any conclusions based on this data are inherently susceptible to speculation and manipulation. The tax court has the expertise to sort through the complexities of such an analysis, evaluate the data, and reach its own conclusions. We are unable to say under the facts of this case that the court clearly erred in either its assumed lot prices or its assumed selling period.

### B. *Market Approach*

■ The Hansens also argue that the tax court's partial reliance on the market approach was erroneous and not supported by the evidence. They argue that because the comparable land sales submitted by their expert do not support the court's final conclusion as to market value, the court could not rely on the market approach. The record, however, reveals that both experts presented evidence of market value based on the market approach and that the court's final conclusions as to market value fell between the values presented by the two experts. Although the court should not attempt to "split" the value of the two opposing experts, we conclude that in this case the court carefully considered the evidence and reached a reasoned result. Under the facts of this case, we are not persuaded that the court's partial reliance on the market approach was clearly erroneous and not supported by the evidence.

Affirmed.