[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff brings this real estate tax appeal challenging the assessor's valuation of the subject property beginning on the grand list of October 1, 1994, based upon the revaluation date of October 1, 1992.
The subject property consists of 63.4 acres of vacant land located on a gravel town road known as Cone Road. The subject property has approximately 1,250 feet of road frontage along Cone Road. The land is generally level throughout the acreage. Approximately 10% of the subject land is covered by wetlands. A band of wetlands runs along the southerly portion of the site abutting Cone Road. Another band of wetlands runs through the central portion of the site. The subject property is located in the Residence and Agriculture District (R-40 zone). The minimum lot area required for residential use is 40,000 square feet with road frontage of 200 feet. Rear residential lots require a minimum of 160,000 square feet and a 40 foot road frontage. Electricity and telephone service is available to the site. Residential use must rely on septic sewer systems and well water. CT Page 11035
The plaintiff purchased the subject property on April 21, 1994 for $95,000 from the estate of Emma B. Lord. When the plaintiff purchased the subject property, it was classified as forest land pursuant to General Statutes § 12-96, which provides that the assessor shall place a value not exceeding $100 per acre on woodlands of not less than twenty-five acres upon application of the owner for the woodlands classification. The assessor had valued the 63.4 acres at $6,320 pursuant to § 12-96 prior to October 1, 1994. When the plaintiff purchased the subject property, he withdrew the land from the forestry classification. The assessor placed the property back on full assessment on the October 1, 1994 grand list at its fair market value of $260,400. The Board of Assessment Appeals reduced the valuation from $260,400 to $251,400 pursuant to the plaintiffs appeal to that Board.
Both the plaintiffs appraiser, James G. Sauve, and the town's appraiser, Robert J.Flanagan, considered the highest and best use of the subject property for residential use. Flanagan was of the opinion that the property could support a subdivision of eight building lots, whereas Sauve was of the opinion that the property could only support one or two building lots. We agree with both appraisers that the highest and best use of the subject property on October 1, 1992 was for residential development.
Both Sauve and Flanagan used the comparable sales approach to determine the value of the subject property as of October 1, 1992. Sauve's comparables consisted of four parcels of vacant land outside of Andover. Sale one was a 126.8 acre parcel located in the adjoining town of Hebron with 189.86 feet of noncontiguous frontage. Sale one was covered with 60% to 70% wetlands. This sale was situated in a residential zone and the property was purchased for possible residential development of no more than 10 to 15 building lots. Sale one was purchased on April 1, 1992 for $250,000. Sale two used by Sauve was a 52 acre tract of land in Hebron with 50% of the land considered wetlands. This sale had a small frontage of 33 feet. This property sold for $95,000 on April 6, 1992. Sauve's sale three was a 16.95 acre parcel in Tolland which sold for $53,000 on March 20, 1992. This parcel of land had minimal wetlands but it did have 1,098.56 feet of frontage. The fourth sale used by Sauve was a 44.52 acre tract in Ellington which sold for $86,500 on June 5, 1991. This parcel had 321.28 feet of noncontiguous frontage with no wetlands. From an analysis of these four sales, Sauve concludes that the fair market value of the subject 63.4 acres was $2,000 per acre, for a CT Page 11036 total value of $126,800, rounded to $125,000.
In his sales comparison approach, Flanagan utilized the "development method" and the direct sales comparison method in valuing the property. Flanagan's conception of the "development method" "entails projecting the retail prices of the building lots, the costs to be incurred in creating the infrastructure to serve the lots and other indirect costs associated with marketing, legal, engineering, overhead, and profit. Also, a sellout period is projected." (Defendant's exhibit 2, p. 30.) Basically, in using this method, Flanagan put himself in the shoes of a developer who owns a tract of land. As a developer, Flanagan considers what is necessary for him to create saleable residential building lots in a subdivision. Once Flanagan has developed the total cost to obtain saleable building lots in a subdivision, he next turns to see what the market is for such building lots. Flanagan then deducts the total cost to develop the lots such as engineering costs to make up a subdivision plan for submission to the town's planning commission, the necessary costs to test the soil for wells and septic systems, the cost to obtain the approval of the inland wetlands commission, the cost to meet conditions of the planning commission which might consider roads, road improvements, traffic and the environment, and finally the cost of bonding required by the town and legal fees necessary to bring the whole development to fruition. Deducting all of these costs from what Flanagan finds to be the market value for approved building lots on the subject property, Flanagan arrives at a net value by multiplying the final lot value by the number of lots which Flanagan estimates can reasonably be obtained from the subject.
Applying this approach, Flanagan determined that the subject property could be divided into eight building lots that would average $40,000 each "in sales price in 1992 considering size, physical characteristics and location." (Defendant's exhibit 2, p. 31.). From the $320,000 total for the eight lots, Flanagan deducted 25% for costs such as sales and marketing, engineering and permits, taxes, insurance and developer's profit, to arrive at a value of $240,000. Flanagan then applied a discount factor of 10% for a two year sellout period and arrived at a final valuation of $208,000 using the development method. Although the subject property was on an unpaved town road, Flanagan saw no need to consider any road development as a cost to subdivide the land. This expectation seems shortsighted since a wetland strip on the subject runs parallel to and close to Cone Road, which CT Page 11037 would raise concerns regarding drainage from the subject property to Cone Road.
We first address the issue of whether the development method used by Flanagan is an appropriate method for determining the fair market value of the property in this case.
When determining the fair market value of vacant land, the comparable sales method is the most common and the most preferred method to use. The Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992), p. 302. However, where vacant land has subdivision and development as its highest and best use, the "development method" may be used in appraisals when comparable sales are scarce. Id., p. 307.
Basically, the development method is a development cost approach which is "designed to reflect, through cash flow analysis, the current price a developer-purchaser would be warranted in paying for the land given the cost of developing it and the probable proceeds from the sale of developed sites."Hansen v. County of Hennepin, 527 N.W.2d 89, 91 n. 1 (Minn. 1995).
In Hansen, the court noted that there are three traditional approaches to value: market or sales comparison, replacement costs and capitalization of income. Hansen v. County of Hennepin, supra, 527 N.W.2d 93. The court further noted that normally, unimproved raw land is valued using the market approach to value. Id. Since the trial court in Hansen relied partially on the development cost approach, the court undertook an analysis of this method. Although the court in Hansen approved of the use of this method, it recognized that this approach was complex and susceptible to manipulation, and should be used only when traditional methods are not wholly reliable and only when a proper foundation has been laid. Id., 94. The court in Hansen
laid out three conditions to consider before accepting evidence supporting the development cost approach: (1) the land is ripe for development; (2) the owner can reasonably expect to secure the necessary zoning and other permits required for the development; and (3) the completion of the development will not be too remote in time. Id.
The development method is founded on the reasonable probability that development is imminent and the land is ripe for development. Hansen v. County of Hennepin, supra, 527 N.W.2d 93. CT Page 11038 The issue of the probable development of land and its effect on value was raised in Budney v. Ives, 156 Conn. 83, 239 A.2d 482
(1968).[1] At issue in Budney was the effect of a probable zone change that would permit the development of land, and therefore, enhance the land's value at the time of condemnation by the state. The court in Budney held that where there is proof of a reasonable probability that such a zone change will occur, that fact is properly considered in determining the fair market value of property taken by condemnation. Id., 90. As the court inBudney noted, "[w]ishful thinking, optimistic conjecture, speculation, rumor and unfounded prognostifications do not furnish a proper basis for a finding that a litigant has proved the reasonable probability of a future change in zone." Id., 89-90.
Pursuant to Hansen and Budney, we find that the development approach, without proof of a firm foundation that the development of the subject land was imminent, cannot be used to support the determination of fair market value of the subject as a development of eight lots as proposed by Flanagan. We find that Flanagan's use of the development approach in this case is too speculative when there is no evidence of imminent development. We further find that Flanagan does not provide any explanation or analysis showing the basis for his determination of the lot price, costs and discount factor that he utilized in applying this method. Without any corroboration, we find Flanagan's use of the development method to value the subject property to be flawed because of its speculative nature.
Turning to Flanagan's direct sales comparison approach, Flanagan utilized seven comparable sales. Flanagan's seven comparables included a 78 acre tract of land in Andover which was approved for a 21 lot subdivision. This tract sold on July 21, 1991 for $400,000, or $5,128 per acre. The remaining six comparables relied on by Flanagan were much smaller lots ranging from 16 to 22 acres, which sold at $2,907 to $4,425 per acre. Only sale one with 78 acres was located in Andover. Flanagan placed most reliance on this comparable because it is on Gilead Road near the subject property, and it was intended for residential development. Based on his comparables, Flanagan arrived at a general unit value indicator in the range of $3,000 to $3,500 per acre, for a total value range of $190,000 to $222,000. Flanagan basically averaged this range of values to support the $208,000 fair market value he arrived at using the development method. CT Page 11039
As previously discussed, the plaintiffs appraiser, Sauve, arrived at a per acre value of $2,000 based upon four comparable sales. Of the four comparables, sales one and two in Hebron contain a substantial amount of wetlands. Whereas the subject is covered by only 10% of wetlands, sale one had 60 to 70% wetlands, and sale two had 50% wetlands. Sale four had no wetlands but this 44.52 acre tract of land consisted of two noncontiguous parcels. The only comparable sale selected by Sauve that offers any level of comparison to the subject is sale three on Buff Cap Road in Tolland. Sale three had a long road frontage similar to the subject but substantially less acreage. This parcel sold on March 20, 1992 for $3,127 per acre.
We are mindful that our task is to determine value once we find that the assessor's valuation is excessive. Ireland v. Boardof Tax Review, 242 Conn. 550, 558, 698 A.2d 888 (1997). Given that the value set by the town's own appraiser was $208,000, and not the $260,400 set by the assessor, we can only conclude that the town's valuation, reduced by the Board of Assessment Appeals to $251,400, is excessive.
We are not satisfied that the analysis provided by either appraiser gives us a fair understanding of the real estate market for the subject land. Neither appraiser did a detailed analysis or explained the basis for their adjustments of the comparable sales, but made only a cursory reference to adjustments. We recognize that both appraisers were limited in what was available in the market to use as comparables. However, under these circumstances, we are compelled to make a finding of value. To find value, we examine the comparables used by both appraisers and make our own adjustments. Using this process and our general understanding of value, we consider $2,900 per acre to be a fair market value as of October 1, 1992. $2,900 per acre x 63.4 acres gives us a total fair market value of the subject property as of October 1, 1992 of $183,860.
Accordingly, judgment may enter in favor of the plaintiff, without costs to either party. The assessor shall correct the assessment of the property beginning on the list of October 1, 1994 and thereafter to reflect a fair market value of $183,860.
Arnold W. Aronson, Judge Trial Referee