STATE OF MINNESOTA

IN SUPREME COURT

A24-0847

Tax Court                                                                                               Gaïtas, J.

Burnsville Medical Building, LLC,

          Relator,

vs.                                                                                               Filed:  May 14, 2025
                                                                                               Office of Appellate Courts
County of Dakota,

          Respondent.

_____

Larry D. Martin, L.D. Martin Law Office, Victoria, Minnesota, for relator.

Kathryn M. Keena, Dakota County Attorney, Suzanne W. Schrader, Assistant Dakota County Attorney, Hastings, Minnesota, for respondent.

_____

S Y L L A B U S

1.      The tax court did not err by using market rent rather than effective net rent to calculate the subject property's potential gross income under the income capitalization approach to valuation because the taxpayer's tenant improvement allowances and rent concessions were typical of the market.

1

2.      The tax court did not clearly err by rejecting the taxpayer's proposed occupancy adjustment under the sales comparison approach to valuation.

Affirmed.

Considered and decided by the court without oral argument.

O P I N I O N

GAÏTAS, Justice.

This appeal from the tax court concerns the valuation of a medical office building located in Burnsville. Following a trial, the tax court concluded that the value of the subject property for 2021 property taxes was $9,300,000, which is higher than Dakota County's initial assessed value. Before this court, the taxpayer, Burnsville Medical Building, LLC, argues that the tax court erred by using market rent, rather than effective net rent, to calculate the value of the subject property under the income capitalization approach to valuation, even though the taxpayer presented no trial evidence of excessive tenant improvement allowances or other atypical tenant rent concessions. Additionally, the taxpayer argues that the tax court clearly erred by rejecting an occupancy adjustment that its appraisal expert relied on in valuing the subject property. Because the tax court did not err, we affirm.

**FACTS**

The subject property is a three-story medical office building located in Burnsville near the intersection of Interstate 35W and Interstate 35E. Relator Burnsville Medical Building, LLC, owns the building and is the taxpayer. Because the subject property is in Dakota County, respondent Dakota County is the taxing authority.

At issue here is the value of the subject property for the purpose of 2021 taxes owed. In January 2020, Dakota County assessed that value as $8,007,800. At the time of the assessment, the subject property was 25 years old. It consisted of 105,821 square feet of land (2.43 acres), a building, and a parking deck. The building was 50,841 square feet, with 47,894 square feet of rentable space. On the assessment date, the building was divided for multi-tenant use, and it had seven tenants, resulting in an occupancy rate of 90.13 percent. The parking deck was 22,376 square feet and could accommodate 254 cars.

Following the County's assessment, the taxpayer petitioned the Minnesota Tax Court, asserting that Dakota County's assessment overstated the value of the subject property. On July 11, 2023, the tax court held a trial.

At the trial, the taxpayer presented the appraisal report and testimony of Kelsey K. Hornig, MAI, CCIM, a certified general property appraiser.[1] At the taxpayer's request, Hornig assessed the value of the subject property in March 2023 using January 2020 as the date of value.

There are several approaches to calculating the market value of real property. It is preferable to calculate market value using at least two approaches "because the different methods can serve as checks on each other." *Menard, Inc. v. County of Clay*, 886 N.W.2d

---

[1] Hornig, whose last name was formerly Malecha, is the same expert whose opinions we addressed in our recent decision in *Tamarack Vill. Shopping Ctr., LP v. County of Washington*, 9 N.W.3d 820, 826-30 (Minn. 2024). At the trial in this case, Hornig testified that the MAI designation means "Member of the Appraisal Institute," which signifies that an appraiser has obtained "above and beyond [the] education [that] . . . is required to achieve a certified general license through the state." Hornig testified that CCIM means "Certified Commercial Investment Member," which "is more of a designation for real estate investment analysis."

804, 819 (Minn. 2016).  Valuation approaches "are applied in light of a property's highest and best use"—the use "that is physically possible, legally permissible, financially feasible, and maximally productive."  *See Tamarack Vill. Shopping Ctr., LP v. County of Washington*, 9 N.W.3d 820, 832 (Minn. 2024) (citation omitted) (internal quotation marks omitted).

Hornig testified that she used two approaches to assess the value of the subject property:  the "sales comparison approach" and the "income capitalization approach."  The sales comparison approach "measures the market value of real estate by looking at the price at which comparable properties sold."  *Bloomington Hotel Invs., LLC v. County of Hennepin*, 993 N.W.2d 875, 889 (Minn. 2023).  And the income capitalization approach "analyzes the value of real property by assessing the capacity of the property to generate income to the owner of the real property."  *Id.* at 881.  The income capitalization approach consists of the following steps:

(1) estimation of the subject property's *potential gross income*;
(2) calculation of the subject property's *effective gross income* by subtracting the estimated vacancy and collection losses;
(3) calculation of the subject property's *net operating income* by estimating its total operating expenses and subtracting them from the estimated effective gross income;
(4) application of a direct or yield capitalization technique[2] to the data to arrive at a *final estimate of value*; and

---

2    Within the income capitalization approach, there are two methods of income capitalization:  (1) the direct capitalization method and (2) the yield capitalization method. Appraisal Institute, *The Appraisal of Real Estate* 432–33 (15th ed. 2020).  Under the direct capitalization method, "a single year's income is divided by an income rate or multiplied by an income factor to reach an indication of value. . . ."  *Id.* at 432.  Under the yield capitalization method, "future economic benefits are converted into a value indication by discounting them at an appropriate yield rate . . . or applying an overall capitalization rate that reflects the investment's income pattern, value change, and yield rate."  *Id.*

4

(5) "[i]f necessary," adjustment of the value indicated at the prior step to "account[] for the cost of leasing up the property."

*Tamarack Vill.*, 9 N.W.3d at 832 (emphases added) (quoting Appraisal Institute, *The Appraisal of Real Estate* 432 (15th ed. 2020)).

According to Hornig, the value of the subject property calculated using the sales comparison approach was $7,175,000. She arrived at this figure by considering five other properties with similar market conditions, access, net rentable area, age, land-to-building ratio, use, and occupancy, and by making adjustments to account for differences between the five comparable properties and the subject property.

Among the adjustments used in Hornig's sales comparison analysis, her report states that she made an occupancy adjustment for "in-place occupancy to the comparables in comparison to the subject's occupancy characteristics as of the valuation date." On the date of value—January 2, 2020—the subject property was more than 90 percent occupied. Hornig considered the percentage of space in the comparable properties that was occupied by tenants, and she then adjusted the values of four of the five properties downward. On cross-examination, Hornig acknowledged that she did so even though two of the four comparable properties were more occupied than the subject property and two were less occupied than the subject property. Hornig explained during her testimony—but not in her report—that she elected to make the occupancy adjustment as part of her sales comparison analysis because "the future of the subject is that it has nearly half rolling over within the first year of - - there is a large tenant within the subject property that rolls over in October

5

of 2021. So if you were valuing that property, you would have to take that into consideration."

Using the second approach to valuation—the income capitalization approach—Hornig calculated the market value of the subject property at $7,075,000. She identified the subject property's potential gross income by referring to comparable leased properties and then adjusting the rental rates of those properties to correspond to the subject property. Next, she calculated the effective gross income by calculating and subtracting vacancy and collection loss. Then—significant to the issues now raised on appeal—Hornig decided to reduce potential gross income by (1) $.48 per square foot to account for free rent and (2) a "tenant improvement allowance equal to $30.00 per square foot for the above grade medical office space and $20.00 per square foot for the lower-level medical office space." According to Hornig, these reductions resulted in the subject property's "effective rent," which was significantly lower than the subject property's market rent. Hornig testified that she identified the amounts that she used for the free rent and tenant improvement allowance reductions by reviewing a market survey and her lease comparables. She admitted that there was no evidence in her appraisal that the subject property's tenant improvement allowances or rent concessions, such as free rent, were excessive or atypical of the market. After determining effective gross income—using effective net rent rather than market rent—Hornig calculated the net operating income of the subject property. Finally, Hornig applied a loaded capitalization rate of 7.43 percent to arrive at her final assessment of $7,075,000.

6

Dakota County did not present expert testimony at the trial. Instead, it relied on the prima facie validity of the assessed value of the subject property.[3]

The tax court filed its findings of fact, conclusions of law, and order for judgment on December 8, 2023. As an initial matter, the tax court determined that the taxpayer "overcame prima facie validity by presenting [Hornig's] appraisal." It stated, "[a]lthough the court disagrees with some of her appraisal methodology, the appraisal contained substantial and credible evidence showing the original assessment was incorrect." *Burnsville Med. Bldg., LLC v. County of Dakota*, No. 19HA-CV-21-1303, 2023 WL 8533688, at *8 (Minn. T.C. Dec. 8, 2023). The tax court also rejected most of Dakota County's challenges to Hornig's appraisal of the market value of the subject property.

However, the tax court determined that one of the adjustments Hornig made in using the sales comparison approach—the occupancy adjustment—was "misplaced." *Id.* at *6. The tax court found that Hornig's testimony regarding this occupancy adjustment was not credible. It questioned her decision to adjust all four multi-tenant comparables downward even though two had an "inferior occupancy rate" and two had a "superior occupancy rate." *Id.* at *5–*6. And it observed that adjusting the comparables to the subject property's leased fee value resulted in internally inconsistent adjustments. *Id.* at *6.

---

[3] When a taxpayer challenges a county's valuation of real property by filing a petition in the tax court, *see* Minn. Stat. § 278.01 (2024), there is a prima facie presumption that the assessor's valuation was proper, and "the burden is on the party appealing that assessment to show that it is excessive." *S. Minn. Beet Sugar Coop v. County of Renville*, 737 N.W.2d 545, 558 (Minn. 2007) (citing *In re McCannel*, 301 N.W.2d 910, 923 (Minn. 1980)); *see also* Minn. Stat. § 271.06, subd. 6 (2024).

7

The tax court also rejected one aspect of Hornig's valuation of the subject property under the income capitalization approach. It determined that Hornig improperly calculated potential gross income by using "effective net rent"—an amount she achieved by reducing market rent for free rent and tenant improvement allowances. Citing its own decision in *Tamarack Village Shopping Center, LP v. County of Washington*, Nos. 82-CV-20-2003, 82-CV-20-2004, 2023 WL 2669686, at *7 (Minn. T.C. Mar. 28, 2023), which this court later affirmed, *see* 9 N.W.3d 820 (Minn. 2024), the tax court stated that it was "improper to reduce a market rent estimate to account for such rent concessions." *Burnsville Med. Bldg.*, 2023 WL 8533688, at *8. The tax court explained that the taxpayer had "not presented the court with a sufficient reason to support further reducing potential gross income by a [tenant improvement] allowance or free rent to arrive at an effective net rent." *Id.* Accordingly, the tax court used market rent and not effective rent in calculating the subject property's potential gross income.

The tax court then performed a final reconciliation, weighing the sales comparison and income capitalization approaches. It afforded the income capitalization approach 75 percent weight and the sales comparison approach 25 percent weight. Applying these weights, it determined that the value of the subject property as of January 2020 was $9,300,000.

The taxpayer moved for amended findings or a new trial. Its post-trial motion essentially challenged the tax court's rejection of Hornig's occupancy adjustment under the sales comparison approach and her reductions of potential gross income for free rent and tenant improvements under the income capitalization approach. The taxpayer argued

8

that (1) the tax court should amend its calculation of rent to eliminate "non-existent" tenant improvements, (2) "non-existent" tenant improvements should not be included in effective gross income, (3) the tax court should have reduced effective gross income to account for free rent, and (4) the tax court should have adopted a different occupancy adjustment than the one recommended by Hornig. The tax court denied the motion on both procedural grounds and the merits.

The taxpayer filed a petition for a writ of certiorari to appeal the tax court's decision. Before this court, the taxpayer argues that the tax court erred by using market rent to calculate the subject property's potential gross income under the income capitalization approach and by rejecting Hornig's proposed occupancy adjustment.

**ANALYSIS**

In this appeal, the taxpayer challenges the tax court's valuation of the subject property. We have recognized that "[t]he inexact nature of property assessment necessitates that this court defer to the decision of the tax court unless the tax court has either clearly overvalued or undervalued the subject property, or has completely failed to explain its reasoning." *Tamarack Vill.*, 9 N.W.3d at 831 (quoting *Hansen v. County of Hennepin*, 527 N.W.2d 89, 93 (Minn. 1995)) (internal quotation marks omitted). Thus, this court must "sustain the tax court's valuation determination on appeal unless it is clearly erroneous." *Eden Prairie Mall, LLC v. County of Hennepin*, 797 N.W.2d 186, 192 (Minn. 2011). The tax court's " 'valuation need not be the same as that of any particular expert as long as it is within permissible limits and has meaningful and adequate evidentiary support.' " *Tamarack Vill.*, 9 N.W.3d at 831 (quoting *Montgomery Ward &*

9

*Co. v. County of Hennepin*, 482 N.W.2d 785, 791 (Minn. 1992)); *see also Eden Prairie Mall*, 797 N.W.2d at 194 (requiring that the tax court "adequately explain[] its reasoning and [that] its [valuation] determination [be] supported by the factual record").

We review the tax court's legal determinations de novo and its factual findings for clear error. *Tamarack Vill.*, 9 N.W.3d at 831. "A tax court's factual finding is 'clearly erroneous' if it is 'not reasonably supported by the evidence as a whole.' " *Id.* (quoting *Hansen*, 527 N.W.2d at 93). This court does not "reweigh the evidence or reassess the credibility of witnesses." *Id.*

I.

We first consider the taxpayer's argument that the tax court erred as a matter of law in using market rent rather than effective net rent to calculate the subject property's potential gross income under the income capitalization approach to assessing the subject property's market value. This issue, which requires us to decide whether the tax court applied the correct legal standard, presents a question of law that we review de novo. *Perham Hosp. Dist. v. County of Otter Tail*, 969 N.W.2d 366, 370 (Minn. 2022). Any underlying factual findings by the tax court going to this legal issue are reviewed for clear error. *See All. Hous. Inc. v. County of Hennepin,* 4 N.W.3d 355, 357 (Minn. 2024).

According to the taxpayer, using market rent rather than effective net rent improperly includes future tenant improvements to a property in a valuation. Thus, according to the taxpayer, effective net rent must be used to calculate potential gross income so as to avoid "anomalous results," including "double taxation." The County

10

responds that this court has already rejected the taxpayer's argument in our recent decision in *Tamarack Village*.

We agree with the County. But before turning to our decision in *Tamarack Village* and its applicability here, we briefly address the concepts of market rent and effective net rent.

"When the income generated by an investment property primarily takes the form of rent"—as is true of the subject property in this case—"a fee-simple property valuation will estimate the value of rentable space using *market rent* levels." *Tamarack Vill.*, 9 N.W.3d at 832 (emphasis added). Market rent is "the rent that could be obtained in the open market," and it "may be different than the actual rent negotiated by the parties to a lease." *Id.* (quoting *Archway Mktg. Servs. v. County of Hennepin*, 882 N.W.2d 890, 897 (Minn. 2016)). "To calculate the market rent of the subject property, an appraiser often gathers, compares, and adjusts rental data from comparable leased properties reflecting arm's length transactions." *Id.* (internal quotation marks omitted). Here, the taxpayer's expert Hornig testified that she reviewed a market survey to determine market rents for the subject property. She also compared the market survey with actual rents in comparable buildings.

In certain circumstances, it may be appropriate for an appraiser to use the analytical tool of effective rent. *Id.* at 832–33 (citing *The Appraisal of Real Estate*, *supra*, at 421–22). Effective rent is "the total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions—e.g., free rent, excessive tenant improvements, moving allowances, lease buyouts, cash allowances, and other leasing

11

incentives." *The Appraisal of Real Estate*, *supra*, at 422. As the tax court properly explained, "[e]ffective rent refines a market rent estimate by eliminating atypical concessions from nominal rents." *Burnsville Med. Bldg.*, 2023 WL 8533688, at *8.

"When an appraiser determines it is appropriate to deduct tenant improvement allowances, the appraiser must decide whether those allowances should be considered an above-the-line expense or a below-the-line expense. " *Tamarack Vill.*, 9 N.W.3d at 833 (citation omitted) (internal quotation marks omitted). "An above-the-line expense . . . is considered part of the total operating expenses for the property," whereas "a below-the-line expense . . . is not considered part of the total operating expenses. . . ." *Id.* (citations omitted) (internal quotation marks omitted). "If tenant improvements are considered as above-the-line expenses, they are subtracted from market rents to determine effective market rents." *Id.* (citation omitted) (internal quotation marks omitted).

However, in *Tamarack Village*, we held that, if a tenant improvement allowance is not excessive or atypical—i.e., it is "market-level"—it is considered a below-the-line expense, and using effective rent to calculate potential gross income is not required. *Id.* (citing *Eden Prairie Mall*, 797 N.W.2d at 195–96). We reached this conclusion because a tenant improvement allowance that is not excessive or atypical "is an anticipated below-the-line expense used to estimate market-level rent," and it is therefore "addressed through the selection of the appropriate capitalization rate." *Id.* (citation omitted) (internal quotation marks omitted). In other words, market rent already accounts for non-excessive, typical tenant improvement allowances. *See id.* ("Where tenant improvement allowances

12

are not atypical or excessive, they function as a below-the-line expense that is recovered through market rent.").

To calculate potential gross income for her appraisal of the subject property, Hornig—the taxpayer's expert—deducted tenant improvements and free rent from the market rent and utilized effective rent. She testified, however, that there was no evidence in her appraisal that the subject property's tenant improvement allowances or rent concessions, such as free rent, were excessive or atypical of the market. The tax court rejected Hornig's use of effective rent under these circumstances, determining that it was "improper to reduce a market rent estimate to account for such rent concessions." *Burnsville Med. Bldg.*, 2023 WL 8533688, at *8. In its valuation of the subject property using the income capitalization approach, the tax court relied on market rent and not effective rent to calculate potential gross income.

The taxpayer argues that, as a matter of law, the tax court should have used effective rent rather than market rent in calculating the subject property's potential gross income. However, our decision in *Tamarack Village* holds that market rent, and not effective rent, generally should be used when calculating potential gross income under the income capitalization approach to valuation. *Tamarack Vill.*, 9 N.W.3d at 833–34. Although the taxpayer advances several arguments as to why this rule is incorrect, the *Tamarack Village* decision rejects those same arguments. *See id.* (rejecting arguments that the rule results in the appraisal of non-existent improvements, is contrary to Minnesota statutes, and is contrary to Minnesota case law).

*Tamarack Village* recognizes one circumstance where it is appropriate to reduce market rent for tenant improvement allowances and rent concessions when calculating potential gross income. *Id.* That circumstance is when tenant improvement allowances or other rent concessions such as free rent are excessive or atypical for the market. *Id.*

Here, the tax court found that the taxpayer failed to present "the court with a sufficient reason to support further reducing potential gross income by a [tenant improvement] allowance or free rent to arrive at an effective net rent." *Burnsville Med. Bldg.*, 2023 WL 8533688, at *8. The taxpayer does not challenge that factual finding. And the record supports it.

Hornig testified that tenant improvement allowances *are* included in market rent for buildings such as the subject property. She testified that tenant improvement allowances were included in the market rents she used in her valuation calculations under the income capitalization approach. And she acknowledged that there was no evidence that the subject property's tenant improvement allowances were excessive or atypical for the market. As to rent concessions such as free rent, Hornig did not testify that free rent is "typical" for the medical office building market. None of the comparable buildings included in Hornig's report offered free rent during the 2020 assessment year. Moreover, just one tenant of the subject property received free rent at the beginning of the lease. And that occurred in 2018—before the date of value here. Thus, there was no evidence before the tax court that free rent is typical in the market. Likewise, there was no evidence of atypical free rent offered at the subject property. The record therefore supports the tax court's finding that there was no basis for reducing potential gross income to an effective net rent. Because

14

the finding has record support, it is not clearly erroneous. *See Tamarack Vill.*, 9 N.W.3d at 831.

In sum, given our decision in *Tamarack Village*, we conclude that the tax court did not err as a matter of law by using market rent and not effective net rent to calculate the subject building's potential gross income. Furthermore, applying our deferential standard of review, we conclude that the tax court's factual finding that the taxpayer did not present "a sufficient reason to support further reducing potential gross income by a [tenant improvement] allowance or free rent," was not clearly erroneous. *See All. Hous.,* 4 N.W.3d at 357.

## II.

We next consider the taxpayer's argument that the tax court clearly erred by failing to consider "the near-term risk of future destabilizing vacancy when estimating an occupancy adjustment based upon the premise that changes in occupancy relate to the leased fee characteristics of the subject property." This argument is a challenge to the tax court's decision not to accept the occupancy adjustment recommended by Hornig as part of her sales comparison approach to valuating the subject property. The County responds that the taxpayer's argument is "misplaced, confusing, and unpersuasive." It points out that considering the actual lease term in place at the subject property is inappropriate in a fee simple valuation analysis and that Hornig's appraisal established that the subject property did *not* have a "destabilized occupancy."

Although the taxpayer's brief suggests that the tax court's alleged error presents a legal issue, the taxpayer is challenging the tax court's credibility determinations and factual

15

findings concerning the report and testimony of the taxpayer's expert, Hornig. Thus, our clear error standard of review applies. *See Tamarack Vill.*, 9 N.W.3d at 831 (stating that this court does not "reweigh the evidence or reassess the credibility of witnesses").

As noted, Hornig applied an occupancy adjustment in her appraisal report to reduce the market value of the subject property under the sales comparison approach. Her report states that the occupancy adjustment was made due to "in-place occupancy to the comparables in comparison to the subject's occupancy characteristics as of the valuation date." As of the date of value, the subject property was more than 90 percent occupied. Hornig compared the subject property's occupancy to the occupancy of the comparable properties. However, even though two of the comparable properties had higher occupancy rates than the subject property—being 100 percent occupied—Hornig adjusted the value of those comparable properties downward. She did the same for the two comparable properties with lower occupancy rates than the subject property. When pressed on cross-examination about her rationale for adjusting all of these values downward for the purpose of comparison with a property that was over 90 percent occupied, Hornig explained that she did so because a large tenant of the subject property—which leased 53.1 percent of the subject property's square footage—had a lease that was set to expire in October 2021, and the adjustment was necessary to reflect a (potential) future vacancy.

The tax court declined to adopt Hornig's occupancy adjustment. It reasoned that "relying on the subject property's upcoming lease end date mean[t] [the appraiser] was adjusting the comparables to the subject property's leased fee value," and not its fee simple value. Consequently, according to the tax court, the adjustments "are internally

16

inconsistent, as they adjust the comparables downward regardless of whether the occupancy was higher or lower than the subject's." *Burnsville Med. Bldg.*, 2023 WL 8533688, at *6 *Id.* at *5–6.

The taxpayer now argues that the tax court had a duty to consider a "destabilized occupancy"—the expiration of the large tenant's lease almost two years after the date of value—and that it erred in failing to do so. This argument fails, however, because the record does not support the taxpayer's assertion that there was a "near-term risk of future destabilizing vacancy." The date of value was January 2020, and the large tenant's lease expiration date was 21 months later. And there is no evidence in the record before the tax court that the large tenant planned to leave the subject property when its lease expired almost two years after the date of value.[4]

Moreover, the tax court found that the internal inconsistencies in Hornig's downward adjustments of the values of all of the comparable properties—even those that had higher occupancy rates than the subject property—created a "legitimate question of credibility." *Id.* at *5. Because we defer to the tax court's credibility determinations, we will not disturb the tax court's finding that Hornig's credibility as to the occupancy adjustment was questionable.

Finally, although Hornig's occupancy adjustment was made as part of her sales comparison analysis of the subject property, the taxpayer's brief to this court seemingly argues that such an adjustment should be allowed as part of the income capitalization

---

[4] According to the County, the large tenant did ultimately leave after its lease expired in October 2021.

approach. To the extent that the taxpayer contends that an occupancy adjustment is appropriate under this other valuation approach, that argument is forfeited. *See Macy Retail Holdings, Inc. v. County of Hennepin*, 899 N.W.2d 451, 455 n.2 (Minn. 2017) (determining that a taxpayer's argument that was not raised before the tax court was forfeited). Hornig's report does not include an occupancy adjustment as part of the income capitalization analysis. During her trial testimony, she only discussed the occupancy adjustment as part of her sales comparison analysis. And it does not appear that the taxpayer argued before the tax court that any occupancy adjustment should have been made in valuing the subject property under the income capitalization approach.[5]

For these reasons, we reject the taxpayer's argument that the tax court erred by failing to apply the taxpayer's proposed occupancy adjustment. We discern no error in the tax court's decision not to use the taxpayer's proposed occupancy adjustment in valuing the subject property under the sales comparison approach.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the tax court.

Affirmed.

---

[5] The taxpayer's brief also asserts that lease-up costs—the costs associated with filling vacancies, including tenant improvements—must be deducted under the income capitalization approach due to the "future destabilizing vacancy." *See The Appraisal of Real Estate*, *supra*, at 432. We reject that argument. As noted, there was no impending vacancy in the subject property. The large tenant's lease expiration date was 21 months after the date of value. Moreover, Hornig's report did not include any adjustments for lease-up costs, and the taxpayer did not elicit any testimony at the trial regarding the deduction of lease-up costs. Thus, there is no record support for the taxpayer's argument regarding lease-up costs.