**EDEN PRAIRIE MALL, LLC, Relator,**

v.

**COUNTY OF HENNEPIN, Respondent.**

No. A09–2229.

Supreme Court of Minnesota.

May 11, 2011.

Thomas R. Wilhelmy, Judy S. Engel, Fredrikson & Byron, P.A., Minneapolis, Minnesota, for relator.

Michael O. Freeman, Hennepin County Attorney, Lisa C. Hahn–Cordes, Beth A. Stack, Assistant County Attorneys, for respondent.

Mark D. Savin, John F. Beukema, Faegre & Benson LLP, Minneapolis, Minnesota, for amicus curiae Minnesota Shopping Center Association.

OPINION

DIETZEN, J.

Pursuant to Minn.Stat. § 278.01 (2010), relator Eden Prairie Mall (EPM) seeks certiorari review of the assessed value determinations by the Minnesota Tax Court for the Eden Prairie Mall and one of the mall's anchor tenants—the Von Maur department store—for the assessment dates of January 2, 2005, and January 2, 2006. The tax court concluded that the market values of both parcels should be increased

to amounts higher than either respondent Hennepin County's (the County) assessed values or the valuation opinions presented by either of the parties' appraisers at trial. EPM argues that the tax court's value determinations were excessive and not supported by the record. EPM, which filed for bankruptcy during the tax court proceedings, also argues that by entering judgment that increased its property taxes, the tax court violated the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. § 362(a)(1) (2006). We affirm the tax court's determination that the automatic stay provision of the Bankruptcy Code does not apply to EPM's tax petitions, but remand the court's market value determinations for further proceedings.

Relator EPM owns and operates the Eden Prairie Mall, a super-regional shopping mall located in Eden Prairie, Minnesota, that includes five anchor tenants and an entertainment wing with an AMC movie theater complex. One of the anchor tenants, the Von Maur department store, is located on a separate parcel leased from EPM. The County Assessor's estimated market value as of January 2, 2005, for the mall parcel was $90,000,000, and for the Von Maur parcel was $8,913,000. The County Assessor's estimated market value as of January 2, 2006, for the mall parcel was $100,000,000 and for the Von Maur parcel was $9,408,000. EPM challenged these valuations by a timely petition to the district court under Minn.Stat. § 278.01, subd. 1 (2010), claiming that the mall and Von Maur parcels had been assessed at values greater than their actual market values and had been unfairly and unequally assessed.

At trial, EPM introduced the expert appraisal testimony of David C. Lennhoff, MAI (Member of the Appraisal Institute), CRE (member of the Counselors of Real Estate), SRPA (Senior Real Property Appraiser). EPM appraiser Lennhoff testified that as of January 2, 2005, the value of the mall was $68,750,000 and the value of the Von Maur parcel was $3,950,000. Additionally, EPM appraiser Lennhoff testified that as of January 2, 2006, the value of the mall was $60,550,000 and the value of the Von Maur parcel was $4,750,000.

The County introduced the expert testimony of Jason Messner, MAI, and the appraisal review testimony of Mark T. Kenney, MAI, SRPA. County appraiser Messner determined that as of January 2, 2005, the value of the mall was $110,000,000 and the value of the Von Maur parcel was $10,000,000. Messner further determined that as of January 2, 2006, the value of the mall was $115,000,000 and the value of the Von Maur parcel was $10,500,000.

The Assessor's estimated market values and the final value opinions of the appraisal experts given at trial were therefore as follows:

Mall Parcel

| Valuation Date | County Assessor | EPM Appraiser | County Appraiser |
|---|---|---|---|
| Jan. 2, 2005 | $ 90,000,000 | $68,750,000 | $110,000,000 |
| Jan. 2, 2006 | $100,000,000 | $60,550,000 | $115,000,000 |

Von Maur Parcel

| Valuation Date | County Assessor | EPM Appraiser | County Appraiser |
|---|---|---|---|
| Jan. 2, 2005 | $8,913,000 | $3,950,000 | $10,000,000 |
| Jan. 2, 2006 | $9,408,000 | $4,750,000 | $10,500,000 |

In its post-trial brief, the County argued that the EPM appraiser's revenue and expense assumptions and value determinations were not supported by the record. The County presented a proposed valuation that "recalculated" the EPM appraiser's value determinations using different revenue and expense assumptions. The effect of the different assumptions was, among other things, to substantially increase the County's calculation of EPM's

net operating income for the mall for both assessment years: from $7,117,082 to $10,489,410 for 2005 and from $6,433,577 to $9,926,670 for 2006. Applying the same capitalization rates used by the County's appraiser to these increased net operating incomes, the County argued that the EPM appraiser's value determination of the mall should therefore be increased from $68,750,000 to $122,876,142 for 2005 and from $60,550,000 to $120,142,410 for 2006. The tax court adopted the County's "recalculated" value determinations almost verbatim;[1] as a result, the court increased the value of the mall by an average of 28.3% over the County's original assessed values and by an average of 8.1% over the appraisal testimony of the County's expert.

After trial, but before the tax court rendered its decision, EPM and its parent company, General Growth, filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York. EPM then sought to stay the tax court proceedings, arguing that they were subject to the automatic stay provision of 11 U.S.C. § 362(a)(1) (2006). The tax court rejected EPM's argument. After the parties submitted post-trial briefs, the tax court issued its findings of fact, conclusions of law, and order for judgment, assessing the mall and Von Maur at the aforementioned values, which were higher than the values proposed by either party's appraisal experts.

On appeal, EPM challenges the tax court's failure to apply the automatic stay provision of 11 U.S.C. § 362(a)(1) and the tax court's conclusions as to the January 2, 2005, and January 2, 2006, estimated market values of the mall and Von Maur parcels. Generally, we review a tax court decision to determine whether the court

lacked jurisdiction, whether the court's decision is supported by the evidence and is in conformity with the law, and whether the court committed any other error of law. *Jefferson v. Comm'r of Revenue*, 631 N.W.2d 391, 394 (Minn.2001). We exercise de novo review of the court's legal conclusions. *F–D Oil Co. v. Comm'r of Revenue*, 560 N.W.2d 701, 704 (Minn.1997). But we overturn the court's factual findings if they are clearly erroneous. *Equitable Life Assurance Soc'y of the U.S. v. Cnty. of Ramsey*, 530 N.W.2d 544, 552 (Minn.1995).

I.

■ We first address EPM's argument that the tax court's decision violates the automatic stay imposed by 11 U.S.C. § 362(a)(1) of the U.S. Bankruptcy Code. In interpreting federal statutes, we "give effect to the plain meaning of [the] statute when the language is clear." *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 11 (Minn.2002). We will not disregard the letter of the law when the words of a statute are clear and free from ambiguity. *Id.*

■ The automatic stay provision of the U.S. Bankruptcy Code, 11 U.S.C. § 362(a)(1), provides that the filing of a petition for bankruptcy

[operates as a stay, applicable to all entities, of] the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other *action or proceeding against the debtor* that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

---

1. The tax court accepted the value determinations but rounded them to the nearest thousand.

(Emphasis added.) Subparagraph (a)(1) of section 362 thus stays the continuation of any "action or proceeding against" a debtor—in this case, EPM—when the debtor has filed a bankruptcy petition. *Carson Pirie Scott & Co. (Southdale) v. Cnty. of Hennepin*, 508 N.W.2d 200, 202 (Minn. 1993) (hereinafter *Carson Pirie Southdale* ).

■ The precise question before us is whether a petition filed by a taxpayer under Minn.Stat. ch. 278 (2010) challenging a property tax assessment is an "action or proceeding against the debtor." To determine "whether a proceeding is against a debtor, the proceeding is to be viewed at its inception." *Carson Pirie Southdale*, 508 N.W.2d at 202 (internal quotation marks omitted).

In *Carson Pirie Southdale*, we addressed whether the automatic stay provision precluded dismissal of a debtor's challenge to certain real property assessments. *Id.* at 201. In May 1991, Carson filed a petition challenging the 1990 estimated market value of its property. *Id.* In August 1991—three months after Carson's petition—Carson filed for Chapter 11 bankruptcy and paid the first half of taxes due May 15, 1991. *Id.* Carson filed another petition in 1992 challenging the 1991 estimated market value of its property but did not pay any of the property taxes due for that year. *Id.* The tax court dismissed the 1991 and 1992 petitions challenging the estimated value of the property because such dismissal was automatic and mandatory under Minn.Stat. § 278.03, subd. 1 (2010), for nonpayment of taxes. 508 N.W.2d at 201.

We affirmed the judgment of the tax court, concluding that "tax petitions filed by Carson are proceedings initiated *by* the debtor, not *against* the debtor, and consequently, the automatic bankruptcy stay of subparagraph (a)(1) does not apply to the petitions and the proceedings thereunder." *Id.* at 202. We rejected Carson's argument that the word "proceeding" under the automatic stay provision was limited to the pre-petition tax assessment and collection administrative process and did not include "court proceedings initiated by the filing of the tax petitions." *Id.* We clarified that under Minn.Stat. ch. 278, proceedings are "initiated by the taxpayer filing a petition." 508 N.W.2d at 202. Because proceedings under chapter 278 are initiated by, not against, the taxpayer, we concluded that they were not subject to the automatic stay under 11 U.S.C. § 362(a)(1). 508 N.W.2d at 202.

■ Here, EPM argues that the automatic stay barred the tax court from entering judgment increasing its property tax liability. In *Carson Pirie Southdale*, we rejected the argument that the entry of judgment of dismissal of Carson's petitions, for failure to pay taxes owed for the tax years at issue, was an "independent action or proceeding" subject to the bankruptcy stay. 508 N.W.2d at 202. Because "the proceeding originated with the filing of the petition, which is . . . by the taxpayer debtor," and because proceedings under Minn.Stat. ch. 278 do not provide for answers or any subsequent pleadings in response to tax assessment petitions, we held that the automatic stay did not apply to the dismissal of Carson's petition. 508 N.W.2d at 202 (citing Minn.Stat. § 278.05, subd. 1 (2010)). We also distinguished petitions challenging tax assessments from cases with multiple claims and multiple litigants, where "a counterclaim or cross-claim *against* a debtor" may be stayed while the claim *by* the debtor proceeds. *Id.* (comparing tax assessment petitions to the context of multiple party litigation and multiple claims in *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir.1992)).

In summary, we conclude that a petition under chapter 278 is initiated by a taxpayer-debtor for the benefit of the taxpayer-debtor, and therefore is not subject to the automatic stay pursuant to 11 U.S.C. § 362. When the taxpayer initiates a petition under chapter 278, it is possible that the overall value of the property and the amount of taxes due may increase, decrease, or stay the same. In any case, the taxpayer assumes that risk. Thus, the tax court is not barred by the automatic stay provision from entering judgment increasing the market value and the tax assessments for the property.

■ EPM also claims that the County's introduction of evidence at trial seeking to increase the real estate taxes on the mall constituted a separate judicial proceeding against EPM, thereby implicating the automatic stay provision. But in *Southdale Circle Partnership v. County of Hennepin*, we rejected the argument that the County's ability to seek an increase in the valuation of the subject property amounted to a counterclaim that prevented the taxpayer from voluntarily dismissing its petition once the County's position was disclosed. 424 N.W.2d 536, 537–38 (Minn.1988) (hereinafter *Southdale Circle* ); *see* Minn. R. Civ. P. 41.01(b) (barring dismissal of an action by a plaintiff over the defendant's objection once a counterclaim has been filed unless the counterclaim remains pending). We explained:

> Under the Minnesota Rules of Civil Procedure, a counterclaim is an independent claim which should be made part of a responsive pleading. Minn. R. Civ. P. 13. However, the procedure for challenging a real estate tax assessment allows only a petition without any answer, return, or other pleading. Minn.Stat. § 278.05, subd. 1.... Thus, a taxing authority has *no avenue* under the stat-

ute to bring an express counterclaim in an assessment challenge.

424 N.W.2d at 537 (emphasis added). We further noted that if section 278.05 were "construed to give rise to an implied counterclaim in the taxing authority, a taxpayer who does nothing would be in a superior position to one who asserts the right to question the valuation." 424 N.W.2d at 538. We therefore rejected any argument that section 278.05 either explicitly or implicitly created an ability to "counterclaim" by the taxing authority. 424 N.W.2d at 537–38. The County has neither the power nor the ability to assert a counterclaim against EPM, *see Southdale Circle*, 424 N.W.2d at 537–38, and has not otherwise initiated any action against EPM in connection with these tax years. We conclude that introduction of the County's appraisal experts' opinions did not create—either explicitly or implicitly—counterclaims that constitute separate "action[s] against the debtor" under section 362(a)(1).

EPM argues, in the alternative, that because the tax court rendered its decision on October 13, six months after EPM filed its bankruptcy petition, the tax court "continued" a judicial proceeding against a debtor that arose before the bankruptcy petition, in violation of the automatic stay. The key language in our prior analysis of section 362(a)(1) in *Carson Pirie Southdale* is that section 362(a)(1) "does not apply to the *petitions and the proceedings thereunder.*" 508 N.W.2d at 202 (emphasis added). The tax court proceedings that flowed from EPM's petition were still part of the original action, *see id.*, even though the County's appraisal expert proposed values for the mall and Von Maur parcels that were higher than the County's original assessed values. Because EPM's petitions under chapter 278 were not actions or proceedings *against* debtor EPM, the entry of the tax court's post-bankruptcy-

petition decision did not violate the automatic stay.

For all the foregoing reasons, we hold that the tax court did not err when it declined to apply the automatic stay provision of 11 U.S.C. § 362(a)(1) to EPM's action challenging the County's tax assessments.[2]

## II.

We next address whether the tax court erred in its January 2, 2005, and January 2, 2006, market value determinations for the mall and Von Maur parcels. EPM argues that the tax court's decision is clearly erroneous, particularly because the court's value determinations are higher than the appraisal testimony presented at trial. Moreover, EPM argues that the tax court clearly erred in failing to amortize certain personal property and intangible assets. Finally, EPM argues that the tax court erred in its determination of the capitalization rate for the mall parcel.

We conclude that the tax court erred in adopting verbatim a valuation of the mall based on the County's recalculation of EPM appraiser Lennhoff's value determinations. The recalculated values argued after trial by the County, and adopted by the tax court, contain several mathematical errors, suggesting that the tax court failed to exercise its own skill and independent judgment. More importantly, the changes in assumptions resulted in value conclusions significantly higher than the appraisal testimony of the parties, for which the tax court failed to adequately explain its reasoning and which appear to be unsupported by the factual record. To explain our conclusions, we begin with the stan-

dard and scope of our review, and then turn to the valuation issues.

■ Our standard of review is deferential: we will sustain the tax court's valuation determination on appeal unless it is clearly erroneous. *Montgomery Ward & Co. v. Cnty. of Hennepin*, 450 N.W.2d 299, 308 (Minn.1990); *Westling v. Cnty. of Mille Lacs*, 512 N.W.2d 863, 866 (Minn. 1994). The tax court's decision is clearly erroneous if, among other things, the decision is not reasonably supported by the evidence as a whole. *Lewis v. Cnty. of Hennepin*, 623 N.W.2d 258, 261 (Minn. 2001). Our deferential review is rooted in separation of powers principles, *cf. Lund v. Hennepin Cnty.*, 403 N.W.2d 617, 624 (Minn.1987) (Yetka, J., dissenting) (noting that the legislative branch has the power to tax and appropriate money), and the inexact nature of the appraisal of real property, *EOP–Nicollet Mall, L.L.C. v. Cnty. of Hennepin*, 723 N.W.2d 270, 285 (Minn.2006). We will not defer, however, when the tax court has clearly misvalued the property or has failed to explain its reasoning. *Nw. Nat'l Life Ins. Co. v. Cnty. of Hennepin*, 572 N.W.2d 51, 52 (Minn.1997).

Minnesota Statutes § 273.11, subd. 1 (2010), provides that "all property shall be valued at its market value." "Market value" is defined in Minn.Stat. § 272.03, subd. 8 (2010), as "the usual selling price," namely, "the price which could be obtained at a private sale or an auction sale, if it is determined by the assessor that the price from the auction sale represents an arm's-length transaction."

■ Generally, we recognize three basic approaches to determining the market val-

---

**2.** EPM argues that the County's assessment was discharged in the bankruptcy for failure to file a timely proof of claim under Rule 3003 of the Federal Rules of Bankruptcy Pro-

cedure, but this issue is not properly before us. Our review is limited to whether the tax court clearly erred in its assessment of the mall's and Von Maur's property values.

ue of real property: (1) the market value approach, which is based on the price paid in actual market transactions of comparable properties; (2) the cost approach, which is based on the proposition that an informed buyer would pay no more for the property than the cost of constructing new property having the same utility as the subject property; and (3) the income capitalization approach, which determines the value of income-producing property by capitalizing the income the property is expected to generate over one year or some other specified period at a specified capitalization or yield rate. *Equitable Life Assurance Soc'y of the U.S. v. Cnty. of Ramsey*, 530 N.W.2d 544, 552 (Minn.1995); *Lewis & Harris v. Cnty. of Hennepin*, 516 N.W.2d 177, 178 (Minn.1994); *see also* Appraisal Institute, *Dictionary of Real Estate Appraisal* 17, 67, 143, 255 (4th ed.2002).[3]

Although both parties' appraisers considered the market, cost, and income approaches to value, both appraisers relied primarily—and in the EPM appraiser's case entirely—upon the income approach, on the ground that any buyer who purchased the mall would do so for the income stream it produces.

## A. *Scope of review*

EPM argues that the tax court's valuation of the mall at an amount higher than both the Assessor's value and the appraisal testimony is contrary to law and violated EPM's right to due process. Essentially, EPM argues that the tax court lacks authority to increase the valuation of its property in this fashion.

■ Minnesota Statutes § 278.05, subdivision 1 (2010), provides:

The Tax Court or district court shall without delay summarily hear and determine the claims, objections or defenses made by the petition and shall direct judgment *to sustain, reduce or increase* the amount of taxes due, and the trial shall disregard technicalities and matters of form not affecting the merits.

(Emphasis added.) Subdivision 1 specifically authorizes the tax court to "increase the amount of taxes due," which necessarily refers to the County's assessment. *See id.* Thus, the question before us is further limited to whether the tax court may increase or decrease the estimated market value of the subject property above or below the appraisal testimony presented at trial.

We have previously had occasion to review only tax court valuations that fall within or below the range of valuation testimony offered by the appraisal experts. *See, e.g., Hansen v. Cnty. of Hennepin*, 527 N.W.2d 89, 95 (Minn.1995) (upholding tax court valuation in part because it "fell between the values presented by the two experts"). We have characterized a valuation as generally reasonable "if it falls within the limits of credible estimates made by competent witnesses," *Hertz v. Hertz*, 304 Minn. 144, 145, 229 N.W.2d 42, 44 (1975). But we have also explained that the tax court is "not bound to accept the valuation of either appraiser." *Am. Express Fin. Advisors, Inc. v. Cnty. of Carver*, 573 N.W.2d 651, 658 (Minn.1998).

Despite the lack of precedent on the precise valuation issue before us, our case law does provide some guidance. In *Carson Pirie Scott & Co. (Ridgedale) v. County of Hennepin*, the tax court valued the

---

**3.** The *Dictionary of Real Estate Appraisal* describes the cost approach as based on the sum of the estimated current cost to construct or replace the existing structure (minus depreci- ation) and the estimated land value. Appraisal Institute, *Dictionary of Real Estate Appraisal* 67 (4th ed.2002).

real property higher than the County's assessed values, but within the range proposed by the appraisers in their reports and through their testimony at trial. 576 N.W.2d 445, 448–50 (Minn.1998) (hereinafter *Carson Pirie Ridgedale* ). We emphasized that the court heard and considered the appraisers' trial testimony and the parties' post-trial briefs, reviewed all three traditional valuation approaches, and explained its reasons for using the income approach. *Id.* at 451. We affirmed, concluding that the tax court followed a "reasoned approach, using the range of values provided by the experts, the court's own judgment and expertise in property valuation, and taking into consideration the other testimony on the record." *Id.*

We conclude that the tax court is not precluded from arriving at a value determination that is lower or higher than the appraisal testimony presented at trial, provided that the court adequately explains its reasoning and its determination is supported by the factual record. We observe that the tax court brings its own expertise and judgment in valuation matters, and its determination need not be the same as the appraisal testimony. But market value determinations involve the exercise of complex and sophisticated judgments of market conditions, anticipated future income, and investor expectations, particularly with respect to income-producing properties such as the subject properties here. When the tax court concludes that the market value of a subject property is lower or higher than the appraisal testimony, it should carefully explain its reasoning for rejecting the appraisal testimony and the grounds for adopting a lower or higher value, and adequately describe the factual support in the record for its determination. If the court fails to do so, it runs the risk of having its determination overturned.

### B. *Valuation summary*

The Assessor's estimated market values, the final value opinions of the appraisal experts given at trial, and the tax court's determinations of value in this case are as follows:

Mall Parcel

| Valuation Date | County Assessor | EPM Appraiser | County Appraiser | Tax Court |
| --- | --- | --- | --- | --- |
| Jan. 2, 2005 | $ 90,000,000 | $68,750,000 | $110,000,000 | $122,876,000 |
| Jan. 2, 2006 | $100,000,000 | $60,550,000 | $115,000,000 | $120,142,000 |

Von Maur Parcel

| Valuation Date | County Assessor | EPM Appraiser | County Appraiser | Tax Court |
| --- | --- | --- | --- | --- |
| Jan. 2, 2005 | $8,913,000 | $3,950,000 | $10,000,000 | $ 9,850,000 |
| Jan. 2, 2006 | $9,408,000 | $4,750,000 | $10,500,000 | $10,490,000 |

In its post-trial brief, the County argued that some of EPM appraiser Lennhoff's assumptions and value determinations were unreasonable. The County "recalculated" Lennhoff's market values, using what it considered more appropriate assumptions; the effect of the change in assumptions was to increase the determination of the market value of the mall as of January 2, 2005, from $68,750,000 (as originally estimated by Lennhoff) to $122,876,142, and as of January 2, 2006,

from $60,550,000 (as originally estimated by Lennhoff) to $120,142,410.

The tax court rejected both appraisers' opinions of market value and adopted, verbatim, the proposed calculation of market values presented by the County in its post-trial brief, including several arithmetic errors.[4] We have discouraged the district courts from adopting one party's proposed findings of fact and conclusions of law. *See, e.g., Lundell v. Coop. Power Ass'n,* 707 N.W.2d 376, 380 n. 1 (Minn. 2006) (stating that adopting one party's proposed findings "does not allow the parties or a reviewing court to determine the extent to which the court's decision was independently made"); *In re Children of T.A.A.,* 702 N.W.2d 703, 707 n. 2 (Minn. 2005) ("[T]he district court's findings should reflect the court's independent assessment of the evidence and this is best accomplished by the district court exercising its own skill and judgment in drafting its findings."). Similarly, adopting verbatim the recalculated assumptions and nearly verbatim the value determinations of one appraiser presented in a post-trial brief raises doubts over whether the tax court exercised its own skill and independent judgment. Consequently, we examine whether the tax court adequately explained its reasoning for adopting the County's recalculated assumptions and for reaching value determinations that exceed those presented by the parties' appraisers.

### C. Net operating income

The appraisers testified, and the tax court agreed, that the income capitalization approach was the most reliable indicator of value of the subject property. Under the income capitalization approach, the appraiser determines the value of the subject real property by dividing the net operating income of the property by the capitalization rate attributable to the property. The net operating income (NOI) is the actual or anticipated net income that remains after all operating expenses are deducted from gross income, but before debt service and book depreciation are deducted. *See* Appraisal Institute, *The Appraisal of Real Estate* 457 (13th ed.2008).

The income generated by investment properties such as the subject property consists primarily of rents. In valuing a fee simple interest in property, the value of rentable space is estimated using market rent levels. *Id.* at 453. Typically, an appraiser conducts extensive market research to determine market rents: the rent that a property should bring in a competitive open market "reflecting all conditions and restrictions of the typical lease agreement," including among other things, use restrictions, expense obligations, term of the lease, renewal and purchase options, and tenant improvement allowances. *Id.*

Where market conditions require rent concessions, an appraiser must further determine a property's effective rent. *See id.* at 454. Effective rent is an analytical tool used to compare leases and develop effective market rents. *Id.* Generally, effective market rent is "the total of base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions—e.g., free rent, excessive tenant improvements, moving allowances, lease buyouts, cash allowances, and other leasing incentives." *Id.* Therefore, in determining effective market rent as part of valuation under the income capitalization approach, the court must adjust for rent

---

4. For example, both the County and the tax court made an arithmetic error in the subtraction of vacancy and credit losses from minimum rent received from in-line tenants and the AMC theater.

concessions that affect future rent receipts.

The parties in this case disputed whether tenant improvement allowances should be deducted from rents paid by existing in-line tenants to arrive at market rents. Generally, a tenant improvement allowance is the dollar amount provided by the landlord to the tenant at the beginning of the lease for the construction of tenant improvements, which sum may or may not equal the tenant's actual cost to construct or remodel the used space. Both appraisers conducted market research of comparable leases for in-line tenants and examined the terms of the existing in-line tenant leases to arrive at effective market rents. It is undisputed that 55 of the 73 in-line leases at the mall had tenant improvement allowances, and that EPM's appraiser's deduction of those allowances reduced his calculation of the mall's net operating income by about $1.3 million annually. The leases between EPM and the tenants are not part of the tax court's record, and the summaries of those leases that were made part of the record do not disclose what concessions were made.

Here, the tax court concluded that reducing effective rents by tenant improvement allowances was inappropriate "because the allowances had already been spent prior to the dates of the valuations." But the court did not indicate whether the tenant improvement allowances were excessive or atypical, or explain why it was appropriate to deduct rent allowances in the year spent. Nor did the tax court explicitly determine effective market rent for the mall as of either valuation date. We conclude that whether tenant improvement allowances should be deducted to arrive at effective market rents must be determined on a case-by-case basis. The determination of whether a tenant improvement allowance should be deducted is part of the overall determination of market rent. Thus, an appraiser must not only examine the terms of the lease, but also must conduct market research to determine whether or not tenant improvement allowances are atypical, to determine effective market rents.

EPM's appraiser testified that market rents from in-line tenants for 2005 and 2006 were $8,076,217 in each year. The County appraiser used the actual rent received by EPM for the estimate of market rent for each of the two assessment years. Those amounts were $8,856,518 and $9,385,935 respectively. The tax court found that the market rent generated by in-line tenants and the AMC theater complex was $9,588,820 and $9,515,505 for the 2005 and 2006 assessment years. Significantly, the tax court's determination for market rents is higher than the appraisal testimony of the parties. The tax court did not explain its reasoning for rejecting the appraisal testimony and the grounds for adopting a higher rent revenue figure, nor did the court explain the factual support in the record for its determination.[5]

---

**5.** The concurring opinion suggests that the tax court adequately explained the basis for its calculation of in-line rents for 2005 of $9,588,820. Specifically, the concurring opinion contends that the conclusion is supported by multiplying Lennhoff's gross leasable area (GLA) of 385,868 square feet by Lennhoff's average rents (before amortization of tenant allowances) of $24.85 per square foot. The tax court, however, did not indicate one way or another the basis for its calculation of $9,588,820. Notably, the tax court determined that the leasable area for the Mall was 394,912 square feet, not 385,868 square feet, and did not calculate average effective rents. Moreover, Lennhoff testified that the average effective rents were $20.93 per square foot, not $24.85. Finally, the EPM and County appraisers testified that total revenues for in-line tenants were $8,076,217 and $8,856,518, not $9,588,820. Absent an adequate explanation and factual support in the

Based upon new revenue assumptions—including, among other things, higher market rents—the tax court's recalculated net operating income for the mall was $10,489,410 for the 2005 assessment, which is an increase of $3,372,328 and $1,134,410 over the respective appraisal testimonies of the parties. For the 2006 assessment, the tax court's recalculated net operating income was $9,926,670, which is an increase of $3,493,093 and $281,670 over the respective appraisal testimonies of the parties. The tax court, however, did not explain its reasoning for increasing the net operating income above the testimony of the parties' appraisers, or describe the factual support in the record for its determination. Moreover, the tax court did not explicitly address whether changing one of EPM appraiser Lennhoff's revenue assumptions would impact other revenue and expense assumptions, such as tenant revenues. We therefore remand the matter to allow the tax court to do so.

### D. *Furniture, fixtures, and equipment*

Minnesota Statutes § 272.03, subd. 1(b) (2010), provides:

> A building or structure shall include the building or structure itself, together with all improvements or fixtures annexed to the building or structure, which are integrated with and of permanent benefit to the building or structure, regardless of the present use of the building, and which cannot be removed without substantial damage to itself or to the building or structure.

EPM argues that because under Minn. Stat. § 272.03, subd. 1(b), taxable real property excludes furniture, fixtures, and equipment, the tax court's failure to adjust net operating income for depreciation of the mall's furniture, fixtures, and equipment does not satisfy the statutory requirements.

To arrive at net operating income attributable to EPM's real property alone, the EPM appraiser adjusted EPM's total net operating income for a return on and of furniture, fixtures, and equipment, using their historical cost rather than their current market value. The tax court rejected the use of historical cost, based on the appraisal report and testimony of Mark Kenney, the County's review appraiser. The tax court concluded that because the value of the mall's furniture, fixtures, and equipment had declined over time, it was appropriate to adjust net operating income for return on and of the market value of furniture, fixtures, and equipment, rather than their historical cost. For reasons unstated, however, the tax court did not actually make such an adjustment to its determination of net operating income.

Having concluded that it was appropriate to adjust net operating income for a return on and of furniture, fixtures, and equipment, the tax court's failure to actually make such an adjustment was clearly erroneous. We remand the matter to the tax court to allow it to correct this error.

### E. *Intangible asset value*

EPM next argues the mall has certain intangible assets that do not constitute real property under Minn.Stat. § 272.03, subd. 1(b), and therefore should be excluded from value. Specifically, EPM argues that the tax court clearly erred in failing to adjust net operating income for return on and of its expenditures for a grand reopening of the mall in 2001, following EPM's acquisition and renovations, and for EPM's contribution toward the cost of construction of the Von Maur department store.

The parties' appraisers disagreed about whether there were any intangible assets

record, the tax court's figure of $9,588,820 is clearly erroneous.

and whether net operating income should have been adjusted for them. The County's appraiser testified that there was no intangible business value associated with the mall. EPM's appraiser, on the other hand, characterized EPM's investment in the Von Maur store and the grand re-opening costs as intangible assets. EPM's appraiser testified that EPM expected to recover its investment in the Von Maur building through increases in sales generated by other mall tenants and, by extension, through increases in the rents paid to EPM by other tenants.[6] Similarly, EPM's appraiser testified that the monies spent on the grand re-opening were expenditures necessary to generate rental income from tenants. Kenney, the County's review appraiser, testified—and the tax court agreed—that adjustments to net operating income for amortization of grand re-opening costs and EPM's investment in Von Maur were inappropriate because the amortized grand re-opening costs and the Von Maur investment were not costs that a prospective buyer would consider in deciding whether to buy the subject property.

As the tax court observed in this case, the grand re-opening costs and EPM's contribution toward the cost of constructing the Von Maur store were incurred in 2001. Based on the testimony of the County's appraiser, the tax court could conclude that those costs did not affect the value of the mall parcel for the 2005 and 2006 assessments. The tax court's findings on this topic are supported by the record and not clearly erroneous.

### F. Capitalization rates

The second component of the income capitalization method is the overall capital- ization rate, which capitalizes a single year's income expectancy into an indication of value. More specifically, the value of an income-producing property can be estimated by dividing the property's net operating income by the capitalization rate. *Appraisal of Real Estate* at 501.

The capitalization rate is extracted from market data. *Id.* at 499–501. The capitalization rate requires extensive market research because it is influenced by, among other things, the degree of perceived risk in the investment, market expectations of future inflation, the rates of return earned by comparable properties in the past, and tax law. *Id.* at 463–64. In this case, both appraisers relied upon the Korpacz Real Estate Investor Survey, which establishes a range of appropriate capitalization rates for various classes of malls based on their geographic location and using retail sales per square foot as a proxy for perceived risk. In particular, under the Korpacz survey, the higher the average retail sales per square foot generated by a mall's tenants, the lower the degree of perceived risk in the mall as an investment, and the lower the range of appropriate capitalization rates.

EPM argues that the particular capitalization rates used by the tax court—7.50% in its January 2, 2005, assessment and 7.25% in its January 2, 2006, assessment— were too low because the court improperly characterized the mall as a Class B + mall, instead of a Class B mall. EPM's appraiser Lennhoff applied a capitalization rate of 8.75% for the January 2, 2005, assessment and 8.50% for the January 2, 2006, assessment, based on classifying the mall as a Class B property. Lennhoff classified the

---

6. Although EPM may also have expected to recover its investment in the Von Maur building through rent paid by Von Maur itself, the record indicates that various conditions precedent to payment of rent had not been met as of the two valuation dates here.

mall as a Class B property based on average gross sales by permanent tenants of $255 per square foot. In calculating average gross sales by permanent tenants, Lennhoff included the AMC theater complex, which generates lower revenues per square foot than in-line tenants.

County appraiser Messner applied capitalization rates (before adjustments for property taxes) of 7.50% for the January 2, 2005, assessment and 7.25% for the January 2, 2006, assessment based on average gross sales by permanent tenants of $325 per square foot, which placed the mall within Class B+ under the 2005 Korpacz survey. The County appraiser's calculation of average gross sales per square foot for permanent tenants excluded the AMC theater complex. The County's review appraiser, Kenney, testified that it is industry custom to exclude sales associated with a movie theater for purposes of determining the appropriate capitalization rate.[7] The tax court found Kenney's testimony to be consistent with the Korpacz Investor Survey.

The calculation of the overall capitalization rate is an important aspect of the computation of market value because a change in the capitalization rate of even a fraction of one percent will significantly change the result. The particular capitalization rate selected reflects the degree of perceived risk of the specific property as an investment, among other things. The tax court's conclusions as to the overall capitalization rates for the mall for the

2005 and 2006 assessments are generally supported by the record now before us. But recognizing that the record may be reopened on remand, and further recognizing that the valuation of the mall is complicated and that the factors underlying the appropriate capitalization rate may be impacted by changes in the appraisal testimony, we conclude that on remand the tax court may also revisit the appropriate capitalization rates.

### G. *Von Maur parcel*

Finally, we turn to the tax court's determinations of the market values of the Von Maur parcel. County appraiser Messner testified to values for the Von Maur parcel for 2005 and 2006 of $10,000,000 and $10,500,000. The tax court determined the market value of the Von Maur parcel for 2005 and 2006 to be $9,850,000 and $10,490,000, respectively. In doing so, the tax court relied primarily on Messner's testimony and adequately explained its value determinations, which were supported by the record. Therefore, we affirm the tax court's assessed values of the Von Maur parcel as of January 2, 2005, and January 2, 2006.

### H. *Summary*

We conclude that the tax court's valuation of the mall parcel was not reasonably supported by the record as a whole. The tax court adopted the County's proposed valuation of the mall parcel based upon a recalculation of EPM appraiser Lennhoff's

7. EPM argues that although "the Tax Court deducted the 77,500 square feet comprising the theater when calculating the level of retail sales per square foot at the mall, it nevertheless applied the capitalization rate it derived using that sales per square foot number to the *entire* income and square footage of the mall, including the 77,500 square feet comprising the theater." Although EPM's argument is not entirely clear, we read it to mean that the

tax court treated AMC theater revenue inconsistently: including it in projecting annual net operating income for the mall but then excluding it in determining the appropriate capitalization rate. We disagree. Net annual operating income is a projection of the mall's total revenue, for which it is appropriate to include AMC theater sales; the capitalization rate is a risk assessment, for which it is industry custom to exclude AMC theater sales.

value determinations without adequately explaining its reasoning or describing the factual support in the record. Accordingly, we remand the tax court's value determinations for 2005 and 2006 for the mall parcel to allow the tax court to adequately explain the reasons for the value determinations and to describe in detail the evidence upon which it relies to support its determinations. Consistent with this opinion, the tax court may, if necessary, reopen the record and conduct a further evidentiary hearing.[8]

Remanded for further proceedings consistent with this opinion.

MEYER, J., took no part in the consideration or decision of this case.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring).

I concur in Part I of the majority's decision and in the decision to remand the matter to the tax court. And I agree with the majority's concern that the tax court adopted verbatim the valuation proposed by the County, particularly given some of the errors in the County's valuation. Nevertheless, I write separately to make two points.

First, the majority criticizes the tax court for not "explicitly address[ing] whether changing one of EPM appraiser Lennhoff's revenue assumptions"—whether tenant improvements allowances should be deducted to arrive at market rents—

"would impact other revenue and expense assumptions, such as tenant revenues." Beyond the tax court's finding as to the square footage of the mall (which neither party challenges on appeal), the only one of Lennhoff's revenue assumptions that the court rejected was the adjustment for tenant improvements. The adjustment for tenant improvements affects the court's calculation of market rents. But it is not clear, at least to me, how the adjustment for tenant improvements affects "other revenue and expense assumptions." If the majority believes that "other revenue and expense assumptions" will be affected by the court's ultimate decision on the appropriate treatment of tenant allowances, it should explain what aspects of the court's decision as to value will be altered before expecting the court to incorporate them into its analysis on remand.

Second, the majority criticizes the tax court for not "explain[ing] its reasoning for rejecting the appraisal testimony [of the parties] and the grounds for adopting a higher rent revenue figure," and contends that the court did not "explain the factual support in the record for its determination" of revenues. In its post-trial brief, the County argued that EPM expert Lennhoff had erred by reducing market rents for amortization of rent concessions. The County therefore argued that total market rents should be $9,588,820. That figure is based on $24.85 per square foot (Lennhoff's figure for average rent before amortization of tenant allowances) times 385,868 square feet (Lennhoff's figure for the mall's gross leasable area). But the tax court made a separate finding as to the mall's gross leasable area that differed from Lennhoff's opinion: the court found

8. Because we conclude that the tax court did not err, as a matter of law, by increasing the market value of the subject properties above the value estimates offered by the parties' appraisers, we do not reach EPM's argument that by doing so the tax court violated EPM's right to due process under the law.

that the mall comprised 394,912 square feet of rentable area, whereas Lennhoff used the figure of 385,868 square feet. If it were not for the difference in square footage, the figure used by the tax court for market rents would equal EPM expert Lennhoff's figure for rents before amortization of tenant allowances.