### 444 LAFAYETTE, LLC, et al., Relators,

v.

### COUNTY OF RAMSEY, Respondent.

### No. A12–0963.

Supreme Court of Minnesota.

April 24, 2013.

---

Thomas R. Wilhelmy, Jennifer A. Kitchak, Fredrikson & Byron, P.A., Minneapolis, MN, for relators.

John J. Choi, Ramsey County Attorney, M. Jean Stepan, Assistant County Attorney, Saint Paul, MN, for respondent.

## OPINION

DIETZEN, Justice.

In this appeal, we consider whether the Minnesota Tax Court followed our remand instructions in *444 Lafayette, LLC v. County of Ramsey (444 Lafayette I)*, 811 N.W.2d 106 (Minn.2012). Originally, relators 444 Lafayette, LLC and Meritex Enterprises, Inc. sought certiorari review of the tax court's market value determinations for the subject property for the assessment dates January 2, 2007; January 2, 2008; and January 2, 2009. After trial, the tax court adopted the market values proposed by respondent Ramsey County in its post-trial brief, which were higher than the value opinions presented by either party's appraiser at trial. Relators appealed, and we reversed and remanded with instructions for the tax court to carefully explain its reasoning for rejecting the appraisal testimony and describe the factual support in the record for its determinations. On remand, the tax court again adopted market values that exceeded the parties' appraisal opinions. Because we conclude that the tax court failed to follow our remand instructions when it calculated parking income and expenses, we reverse.

The subject property is located at 444 Lafayette Road in Saint Paul, Minnesota. It is improved by a six-story, single-tenant office building, which is currently leased to the Minnesota Department of Human Services. During the relevant time period, the subject property was owned by either Meritex Enterprises or 444 Lafayette. Because there are no parking spaces on the subject property, a Reciprocal Easement Agreement (REA) provides access to parking spaces on three adjacent properties. The REA expressly runs with the land and grants to the subject property, among other things, the right to lease 979 parking spaces on designated portions of the adjacent properties for use by employ-

ees, visitors, and delivery persons. In addition, the REA provides that the income generated and expenses incurred from leasing the parking spaces on the adjacent properties shall be attributed to the subject property.

The County Assessor estimated the market value of the subject property at $22,500,000 for all three assessment dates. Relators filed a petition under Minn.Stat. § 278.01, subd. 1 (2012), challenging the County's assessments. At trial, both parties introduced expert appraisal reports and opinions as to market value. Relators presented the appraisal testimony of Michael F. Amundson, who estimated the subject property's market value at $16,200,000 for 2007; $16,300,000 for 2008; and $13,800,000 for 2009. The County presented the appraisal testimony of Jason L. Messner, who estimated market value at $23,900,000 for 2007; $25,000,000 for 2008; and $20,100,000 for 2009.

In its post-trial brief, the County argued for higher value determinations than the value opinions of either party's appraiser. The tax court adopted, verbatim, the County's proposed value determinations of $26,164,000 for 2007; $27,420,000 for 2008; and $22,094,000 for 2009. *444 Lafayette, LLC v. Cnty. of Ramsey,* Nos. 62–CV–08–4369, 62–CV–09–4709, 62–CV–10–166, 2011 WL 1364461, at *2 (Minn. T.C. Apr. 7, 2011).

On appeal, we reversed the tax court's value determinations and remanded the case for further proceedings. *444 Lafay-* *ette I,* 811 N.W.2d at 107–08. We observed that the tax court "incorporated into its findings a nearly verbatim recitation of many of the County's post-trial arguments, including several typographical errors found in the County's post-trial brief." *Id.* at 107. Consequently, we concluded that the tax court " 'failed to exercise its own skill and independent judgment' in valuing the subject property." *Id.* at 108 (quoting *Eden Prairie Mall, LLC v. Cnty. of Hennepin,* 797 N.W.2d 186, 192 (Minn.2011)). We therefore instructed the tax court to "carefully explain its reasoning for rejecting the appraisal testimony and the grounds for adopting a lower or higher value, and adequately describe the factual support in the record for its determination[s]." *Id.* (citation omitted) (internal quotation marks omitted).

On remand, the tax court requested additional briefing from the parties. Subsequently, the tax court issued its remand order, which again determined market values for the subject property that were higher than the opinions of either party's appraiser. *444 Lafayette, LLC v. Cnty. of Ramsey,* Nos. 62–CV–08–4369, 62–CV–09–4709, 62–CV–10–166, 2012 WL 1191598, at *2 (Minn. T.C. Apr. 5, 2012), *amended by* 2012 WL 1191601, at *1 (Minn. T.C. Apr. 12, 2012).

A summary of the County's assessed values, the parties' appraisal opinions, and the tax court's value determinations in both of its orders is as follows:

| Assessment Date | County Assessor | Relators' Appraiser | County Appraiser | Tax Court in *444 Lafayette I* | Tax Court on Remand |
|---|---|---|---|---|---|
| January 2, 2007 | $22,500,000 | $16,200,000 | $23,900,000 | $26,164,000 | $25,100,000 |
| January 2, 2008 | $22,500,000 | $16,300,000 | $25,000,000 | $27,420,000 | $26,000,000 |
| January 2, 2009 | $22,500,000 | $13,800,000 | $20,100,000 | $22,094,000 | $22,500,000 |

## I.

Relators argue that the tax court failed to follow our remand instructions when it valued the subject property higher than the appraisal testimony of either party without explaining its reasoning or describing the factual support in the record. The County responds that the tax court's value determinations are supported by the record as a whole.

■ Generally, our review of the tax court's decision is limited to determining whether the court had jurisdiction, whether its decision was justified by the evidence and in conformity with law, or whether it committed any other error of law. Minn.Stat. § 271.10, subd. 1 (2012). We review the tax court's legal conclusions de novo, but we defer to the tax court's market value determinations unless they are clearly erroneous. *See Cont'l Retail, LLC v. Cnty. of Hennepin,* 801 N.W.2d 395, 398 (Minn.2011). The tax court's value determinations are clearly erroneous if they are not reasonably supported by the record as a whole. *Equitable Life Assurance Soc'y v. Cnty. of Ramsey,* 530 N.W.2d 544, 552 (Minn.1995). We will not defer to the value determinations if the tax court has clearly misvalued the property or completely failed to explain its reasoning. *Cont'l Retail,* 801 N.W.2d at 399.

■ Similarly, we review the tax court's decision on remand for an abuse of discretion. *See Janssen v. Best & Flanagan, LLP,* 704 N.W.2d 759, 763 (Minn.2005). Although our review is deferential, the tax court must execute our remand order according to its instructions and has no power to modify those instructions. *See Halverson v. Vill. of Deerwood,* 322 N.W.2d 761, 766 (Minn.1982).

Essentially, relators' challenge to the tax court's value determinations focuses on three components of this court's remand order: (1) operating expenses, (2) tenant improvement allowances, and (3) parking income and expenses. We will discuss each component in turn.

## A.

■ Relators argue that the tax court failed to explain its reasoning and describe the factual support in the record for its determination of operating expenses. Operating expenses are the periodic expenditures necessary to maintain the real property and continue production of income. *See* Appraisal Institute, *The Appraisal of Real Estate* 459 (13th ed.2008).

To project operating expenses, the relators' appraiser relied on two Twin Cities surveys to determine the market level of operating expenses. He amended his projections at trial based on a recalculated amount of rentable square footage, and then estimated operating expenses at $1,604,646 for 2007; $1,652,786 for 2008; and $1,700,925 for 2009. The County appraiser, however, estimated operating expenses by comparing the subject property's historic operating expenses to similar properties in the market. He testified that the subject property's historic operating expenses were generally consistent with the market, and estimated operating expenses at $1,540,946 for 2007; $1,610,989 for 2008; and $1,610,989 for 2009.

On remand, the tax court concluded that the County appraiser's market study approach was "more persuasive," and adopted his operating expense figures. The court rejected the figures used by the relators' appraiser because they relied upon the NorthMarq survey, which is a local market study that assumed a declining trend in operating expenses. In the court's view, the survey was inconsistent with both parties' appraisal testimony that

indicated operating expenses were increasing in the Twin Cities market. Because the tax court adequately explained its reasoning, we conclude that the tax court did not abuse its discretion with respect to its conclusion regarding the subject property's operating expenses.

### B.

■■ Relators next argue that the tax court failed to explain its reasoning and describe the factual support in the record for its treatment of tenant improvement allowances. Whether tenant improvement allowances should be deducted from market rents to arrive at effective market rents "must be determined on a case-by-case basis" as part of the overall determination of market rents. *Eden Prairie Mall,* 797 N.W.2d at 196. When an appraiser determines it is appropriate to deduct tenant improvement allowances, the appraiser must decide whether those allowances should be considered an "above-the-line expense" or a "below-the-line expense." *See* Appraisal Institute, *supra,* at 480. An "above-the-line expense" is recorded "above" the net operating income line, and is considered part of the total operating expenses for the property. *Id.* In contrast, a "below-the-line expense" is recorded "below" the net operating income line, and is not considered part of the total operating expenses for the property. *Id.* Generally, tenant improvement allowances are the "most common line items recorded below the net operating income line." *Id.*

Although both parties' appraisers determined that the market required a deduction of tenant improvement allowances to arrive at effective market rents, the appraisers accounted for those allowances differently. The relators' appraiser considered tenant improvement allowances as an above-the-line expense and subtracted them from effective gross income to calculate net operating income. Conversely, the County appraiser opted to consider tenant improvement allowances as a below-the-line expense, and then selected slightly higher capitalization rates to adjust for the expense.

On remand, the tax court concluded that the County appraiser's treatment of tenant improvement allowances as a below-the-line expense was "more persuasive." The court explained that considering tenant improvement allowances below the line is "the more frequently used methodology." Further, the tax court's below-the-line adjustment for tenant improvement allowances in determining the overall capitalization rates is supported by the record. Thus, we conclude that the tax court did not abuse its discretion in its treatment of tenant improvement allowances.

### C.

■ Finally, relators argue that the tax court erred in attributing the gross, rather than net, parking income generated under the REA to the subject property. Generally, if an easement runs with the land, benefits the subject property, and burdens an adjacent property, the appraiser must consider whether the easement contributes to the overall value of the subject property. *Federated Retail Holdings, Inc. v. Cnty. of Ramsey,* 820 N.W.2d 553, 562–63 (Minn.2012); *see also Alvin v. Johnson,* 241 Minn. 257, 262, 63 N.W.2d 22, 25 (1954) ("[I]n assessing the plaintiffs' property, it was the assessor's duty to take into consideration the additional value the property had by reason of the easement appurtenant."). Under a fee-simple valuation, the imputed rent attributable to a subject property is determined at market rent. *See TMG Life Ins. Co. v. Cnty. of Goodhue,* 540 N.W.2d 848, 853 (Minn.1995) (using market rent instead of actual rent

paid where department store was paying below-market rent).

The appraisers treated parking income and expenses generated under the REA differently. The relators' appraiser testified that both parking income and expenses were attributable to the subject property, and included them in his determination of market value. To do so, the relators' appraiser multiplied the number of parking spaces the subject property leased—858 employee parking spaces,[1] 24 agency parking spaces, and 160 visitor parking spaces—by the historic leased rates for each parking space—$25 per month on the 2007 and 2008 assessment dates and $30 per month on the 2009 assessment date. Further, the relators' appraiser testified that parking rates in the Saint Paul market remained flat throughout the three assessment periods, and $25 per month reflected market rent for all three years. Based on those figures, the relators' appraiser projected parking income at $200,000 for 2007; $250,000 for 2008; and $260,000 for 2009. He also projected corresponding parking expenses at $200,000 for 2007; $206,000 for 2008; and $212,180 for 2009, resulting in net parking income attributed to the subject property of $0 for 2007; $44,000 for 2008; and $47,820 for 2009.

The County appraiser testified that parking income generated under the REA contributed value to the adjacent properties, and therefore did not include parking income in his determination of the subject property's market value. The County appraiser did state that some of the parking expenses incurred under the REA were attributable to the subject property, but accounted for parking expenses as part of his overall calculation of operating expenses.

On remand, the tax court determined that parking income generated under the REA contributed to the value of the subject property. To calculate parking income, the court rejected the opinion of the relators' appraiser because he used actual rent rather than market rent, and his 10% vacancy factor was unreasonable. Instead, the court concluded that the only market rent figure in the record was $25 per month, and that figure should be multiplied by 979 based on the number of available parking spaces to rent, resulting in annual parking income of $293,700. The court did not adjust parking income by the expenses incurred under the REA, reasoning that the County appraiser included parking expenses attributable to the subject property in his operating expense figures.

A summary of the net parking income calculations is as follows:

| Assessment Date | Relators' Appraiser | County Appraiser | Tax Court in *444 Lafayette I* | Tax Court on Remand |
|---|---|---|---|---|
| January 2, 2007 | $0 | $0 | $264,600 | $293,700 |
| January 2, 2008 | $44,000 | $0 | $264,600 | $293,700 |
| January 2, 2009 | $47,820 | $0 | $264,600 | $293,700 |

We conclude that the tax court failed to adequately explain the basis for its calculation of parking income generated under the REA. The tax court stated that it computed parking income based on the

1. It appears that relators' appraiser misread the lease: it requires only 808 employee park-

monthly market rent of $25 multiplied by the 979 parking spaces "in place" under the REA. But the tax court did not adjust for market vacancy, and the record does not indicate that 979 parking spaces were actually leased. While the tax court adjusted potential gross income for 10% market vacancy, the 10% market vacancy rate relates to the base rent of the office building—not parking income.

Additionally, we conclude that the tax court failed to describe the factual support for not adjusting parking income by the expenses incurred under the REA. The relators' appraiser calculated and deducted parking expenses to arrive at net parking income. The County appraiser, however, did not calculate the amount of parking expenses incurred under the REA. Instead, he testified that parking expenses were already included as nonrecoverable expenses of the subject property. But the County appraiser was not able to identify a specific amount attributable to parking expenses for the adjacent properties. Thus, the only appraisal testimony in the record regarding parking expenses was from the relators' appraiser, and the tax court did not explain why it rejected that testimony and declined to adjust for parking expenses.

In short, the tax court failed to explain its reasoning for calculating parking income in an amount greater than the appraisal testimony. The tax court also failed to describe the factual support in the record for deciding not to adjust parking income by parking expenses. Accordingly, we conclude that the tax court failed to follow our remand instructions in determining the market values for the subject property, and therefore abused its discretion.

ing spaces.

## II.

In summary, the tax court failed to follow our remand instructions in its calculation of parking income and expenses. Without explaining why or identifying supporting appraisal testimony in the record, the tax court determined market values for the subject property higher than the appraisal testimony for all three assessment dates, primarily due to its treatment of parking income and expenses. Consequently, we remand to the tax court to determine the appropriate market vacancy and expense figures to arrive at net income generated by parking under the REA and attributed to the subject property. To do so, the tax court will need additional appraisal testimony. Therefore, on remand the tax court should reopen the record and conduct a further evidentiary hearing regarding the appropriate calculation of net parking income. *See Montgomery Ward & Co. v. Cnty. of Hennepin,* 450 N.W.2d 299, 308 (Minn.1990) (ordering the tax court to conduct a new trial and admit additional evidence).

Reversed and remanded.